IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION
CASE NO. 3:20-CV-03737-CMC

ANTHONY GAGLIANI, *Individually and as Personal Representative of the Estate of* Stephen Walter Gagliani,

Plaintiff,

vs.

SHERIFF OF LEXINGTON COUNTY FOR LEXINGTON COUNTY SHERIFF'S DEPARTMENT; DEPUTY BRANDON KINDER; DEPUTY JASON WILKES; AND STATE CONSTABLE LAWRENCE MARKEY,

Defendants.

DECEMBER 8, 2022
3:10 p.m.
Columbia, SC

PAGES 1 THROUGH 110

---

DAY 2
EXCERPT OF CIVIL JURY TRIAL
(TESTIMONY OF JASON MATTHEW WILKES)
BEFORE THE HONORABLE CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:
Mr. James E. Cavanaugh, Esq.
Mr. Joseph O. Thickens, Esq.
Mr. Stephen F. Krzyston, Esq.
CAVANAUGH AND THICKENS LLC
1324 Gadsden Street
P.O. Box 2409
Columbia, SC 29201

FOR THE DEFENDANTS:
Mr. William H. Davidson, II, Esq.
DAVIDSON WREN AND DeMASTERS PA
1611 Devonshire Drive, 2nd Floor
P.O. Box 8568
Columbia, SC 29202-8568

(Appearances continue on next page)

APPEARANCES (cont'd):

| | |
|---|---|
| FOR THE DEFENDANTS: | Mr. David A. DeMasters, Esq.<br>RILEY POPE AND LANEY LLC<br>2838 Devine Street<br>Columbia, SC 29205 |
| STENOGRAPHICALLY REPORTED BY: | Ms. Carly L. Horenkamp, RDR, CRR, CRC<br>Official Court Reporter<br>U.S. DISTRICT COURT<br>901 Richland Street<br>Columbia, SC 29201<br>954.557.5504 |

## I N D E X

*Certificate* ---------------------------------------------- 110

## W I T N E S S

ON BEHALF OF THE PLAINTIFF: PAGE
JASON MATTHEW WILKES
DIRECT EXAMINATION BY MR. CAVANAUGH 5

(Before Jury, 3:10 p.m.)

THE COURT: All right. You may call your next witness.

MR. CAVANAUGH: Your Honor, plaintiff calls Jason Wilkes to the stand.

THE COURT: All right. Please raise your right hand and state your full name.

THE WITNESS: Jason Matthew Wilkes.

THE COURT: Keep your hand up to be sworn.

JASON MATTHEW WILKES, PLAINTIFF'S WITNESS, SWORN

COURTROOM DEPUTY: Thank you.

MR. CAVANAUGH: One second here, Sergeant Wilkes, if you don't mind.

MR. DAVIDSON: Mr. Cavanaugh, do you think you're going to be able to get to Lance Thomas? I hate to have him tied up when he's --

MR. CAVANAUGH: What time is it?

MR. DAVIDSON: Ten minutes after 3:00.

MR. CAVANAUGH: I mean, it just depends. I really would like to put him up next.

MR. DAVIDSON: Well, that's fine. He's on duty.

(Off-the-record discussion between Mr. Cavanaugh and Mr. Davidson.)

MR. DAVIDSON: We pulled one of our officers they wanted off duty, he's a school resource officer, so he should

03:11 be here, but I was just trying to get a feel for whether they think they're going to reach him or I can release him and send him back to guard the school, so to speak. But I'll just keep him here just in case.

THE COURT: Is he here now?

MR. CAVANAUGH: We're just going to leave him alone, Your Honor, okay? He's here, so if we get through Sergeant Wilkes, we're going to get to Deputy Thomas, okay?

THE COURT: All right.

DIRECT EXAMINATION

BY MR. CAVANAUGH:

Q. Sergeant Wilkes, how are you doing today, sir?

A. Okay.

Q. All right. Can you please tell the jury your full name?

A. Jason Matthew Wilkes.

Q. All right. Sergeant Wilkes, I appreciate you being here today. Let me ask you, are you -- are you still employed with the Lexington County Sheriff's Department?

A. I am not.

Q. You are not. Well, I'm still going to call you Sergeant, okay? I prefer not to call you Mr. Wilkes, I prefer to call you Sergeant. When did you actually leave the sheriff's department?

A. I think it was October 15th of 2021.

Q. October 15th of 2021.

03:12
A. Yes.
Q. And what are you doing today, Sergeant Wilkes?
A. I'm a stay-at-home father.
Q. Stay-at-home dad. Have you done that since you left the sheriff's department?
A. Yes.
Q. All right. When did you go to work for the Lexington County Sheriff?
A. March of 2013.
Q. March of 2013?
A. I believe it was March of 2013.
Q. Okay. And you were hired on in what role originally by the sheriff's department?
A. A patrol deputy.
Q. All right. And at some point you ended up being promoted, correct?
A. Correct.
Q. What role were you in -- did you end up being promoted to?
A. I was first promoted to master deputy.
Q. All right. First promoted to master deputy?
A. Yes.
Q. And what is that?
A. That's --
Q. What is the difference between a deputy and a master deputy?

03:13
A. A master deputy is kind of like an assistant supervisor, I guess you could say.
Q. Okay. And then after that you were promoted again, correct?
A. Correct.
Q. To what role?
A. To sergeant.
Q. All right. And then when you left in 2021, were you a sergeant?
A. I was a sergeant.
Q. Okay. So you had -- you were a deputy, a master deputy, and then a sergeant.
A. Yes.
Q. And you were -- I'm sorry?
A. I just said yes. I'm sorry.
Q. All right. And then you were a sergeant at the time of this incident that we're here about today --
A. Yes.
Q. -- correct?
A. Correct.
Q. All right. Do you have any other law enforcement experience that precedes your time with the Lexington County Sheriff?
A. Not civilian. I was a military police officer.
Q. You were a military police officer.

03:14
A. Yes, sir.
Q. For how many years?
A. Six years.
Q. Okay. Six years immediately prior?
A. Not prior. It actually bled over because I was in the Army Guard at the time, so I think a year or two after I became a sheriff's deputy, I was still in the Guard.
Q. And I take that to mean you're no longer in the Guard, correct?
A. Correct.
Q. All right. When you originally were hired in 2013, do you remember what month it was approximately?
A. I believe it was March.
Q. You said March?
A. I believe it was March.
Q. Okay. All right. Did you go -- did you attend the South Carolina Criminal Justice Academy?
A. I did.
Q. All right. And you went through training, basic training, so to speak, as a Class I law enforcement officer, correct?
A. Yes.
Q. All right. How long is that training, Sergeant Wilkes?
A. At the time it was 12 weeks. I think it's changed now, but...
Q. All right. And so you went through 12 weeks of training,

03:14 correct?
A. Yes.
Q. And you, as a law enforcement officer, actually went through -- go through additional training -- went through additional training between the time you finished the South Carolina Criminal Justice Academy and the time you ended up leaving office, correct?
A. Yes.
Q. All right. Yearly training.
A. Right, yes.
Q. Okay. And that yearly training included legal updates, correct?
A. Correct.
Q. And if you don't mind telling the jury, what is a legal update?
A. So a legal update is put out by the Criminal Justice Academy, and if a law changes or case law changes or there's any information that you put out, they'll do like a video presentation of it and you have to watch it and complete it.
Q. And you completed all of your legal updates. I believe I've seen that you got legal updates in 2014-2015, 2015-2016, 2016-17, '17-18, '18-19, '19-20, correct?
A. That sounds right.
Q. Okay. And would those legal updates have included excessive force or use of force, some of --

03:16
A. Some of them.
Q. -- those legal updates?
A. Some of them, yes.
Q. All right. Would they have included the application of a TASER?
A. Yes.
Q. Okay. And when it might be appropriate to use a TASER and when it might not be appropriate to use a TASER, correct?
A. Yes.
Q. All right. You say some of that -- was that always via video or did you attend a class?
A. From the Criminal Justice Academy for legal updates --
Q. Yes, sir.
A. -- or just in general? That was always a video.
Q. That was always a video.
A. Right, yes.
Q. And you would watch that where?
A. On our computer.
Q. Okay. All right. But you would basically do the training, do the video, and then get certification that it had been done, correct?
A. Right.
Q. You would have to check off.
A. Right.
Q. Okay. All right. And you kept up with your training, no

03:16 problems, and you were up to date on your training at the time of this incident that we're here about today, correct?
A. Yes, correct.
Q. All right. As a master deputy -- excuse me, as a sergeant at the time in 2019, did you supervise other individuals? Did you have deputies and/or master deputies under your direct control?
A. Yes.
Q. Okay. How many did you have, let's say, in September of 2019?
A. I think I had three, two were deputies, I believe, and a master deputy were under me.
Q. Okay. You had two deputies and a master deputy.
A. Right.
Q. Under your direct control.
A. Right.
Q. Or direct supervision, correct?
A. Correct.
Q. And would one of those deputies at the time have been Deputy Brandon Kinder?
A. Yes.
Q. Okay. And you see Deputy Kinder in this courtroom today, correct?
A. Yes.
Q. All right. Have you been trained on responding to

03:17 individuals suffering from a mental health crisis?
A. Yes.
Q. All right. Tell me what you're supposed to do when you respond to a potential mental health call.
A. I mean, every situation is different, so I can't give you -- there's not an ABCD checklist. You just have to form a judgment about what's going on and decide the appropriate action to take.
Q. You're supposed to assess the situation?
A. Assess the situation.
Q. Do you come in guns ablazing on a mental health call?
A. Not unless there's guns involved on the other side.
Q. Right. Okay. So you're supposed to assess the situation and respond to that call based on each situation, correct?
A. Correct.
Q. All right. Earlier today, were you in the courtroom when Constable Markey testified?
A. Yes, I was.
Q. All right. Did you hear his testimony as it relates to the training or the positioning of officers during a response to a scene? Do you know what I'm talking about?
A. I don't know if I recall what --
MR. DeMASTERS: Objection, pitting, Your Honor.
THE COURT: He hasn't done it yet. Overruled.
A. I'm not sure if I recall what his testimony was to it.

03:19 BY MR. CAVANAUGH:
Q. Okay. About taking a -- getting a -- making sure you have control of a situation.
MR. DeMASTERS: Objection, pitting, Your Honor.
THE COURT: Mr. DeMasters, there's no rule against pitting in federal court.
MR. DeMASTERS: All right. Thank you, Your Honor.
BY MR. CAVANAUGH:
Q. I'm sorry, tactical advantage and strategic decision training.
A. Tactical advantage and...
Q. Tactical advantage. Do you understand what I'm talking about with tactical advantage?
A. Being tactical on a call, is that --
Q. Yes.
A. -- what you're talking about?
Q. Yes. You know what I'm talking about.
A. Yes.
Q. You've heard that. Is there anything that you heard that you disagreed with regarding what Constable Markey testified about as it relates to that training or getting a tactical advantage?
A. Well, I don't really recall exactly what he testified to, so I don't know...
Q. Okay. All right. Do you remember this incident that we're

03:20 here about today --

A. Yes.

Q. -- Sergeant Wilkes?

A. Yes.

Q. All right. Tell me what you recall specifically about how you were notified about that incident.

A. I heard the radio dispatch.

Q. Okay. You heard the radio dispatch.

A. Yes.

Q. Where were you that morning when you got the radio dispatch? What were you doing?

A. I believe I was clearing up another call with another deputy.

Q. Okay.

A. I don't remember what that call was, but --

Q. All right. And you heard a radio dispatch.

A. Yes.

Q. Okay.

(Audio played shortly.)

MR. DeMASTERS: Your Honor, they're using their demonstrative --

(Audio stopped.)

MR. DeMASTERS: -- from their opening instead of the actual exhibit that's the bodycam video. I'd prefer they use the actual exhibit that's been admitted into evidence rather

03:21 than demonstrative.

MR. CAVANAUGH: This is what was admitted into evidence, Your Honor.

THE COURT: I thought it was the same thing.

MR. DeMASTERS: This is the demonstrative they used in opening. The bodycam video does not have the calls in it.

THE COURT: Are you talking about on plaintiff's exhibit list, Exhibit No. 1, consolidated body-worn cameras, which was admitted into evidence?

MR. DeMASTERS: Yes, Your Honor, that's the one I'm talking about they should be using rather than the demonstrative they are right now.

THE COURT: And the difference is?

MR. DeMASTERS: The demonstrative has the 911 calls in it and it's not technically into evidence because it's a demonstrative.

THE COURT: Well, we've been listening to the calls ever since the trial began.

MR. DeMASTERS: Well, because we have noticed that we do not believe that areas of the demonstrative are as loud as areas of the actual body camera video that's in evidence.

THE COURT: You're saying that the broadcast or the 911 call is louder on the one that has been admitted into evidence?

MR. DeMASTERS: What I'm saying, Your Honor, is it's

03:22 at least -- you know, I've noticed and I believe that the exhibit that's into evidence, that's been admitted, the body camera videos, there's portions of that that seem to be able -- you can hear that better than you can on their demonstrative. That's all I'm saying, Your Honor. I'd rather them use the one that's been admitted into evidence rather than the demonstrative.

THE COURT: So what is your situation with using the one that's been admitted into evidence? Do you have it loaded on the computer?

MR. CAVANAUGH: This is it.

THE COURT: This is the one that's been admitted?

MR. CAVANAUGH: This is the one that's in evidence, Your Honor.

THE COURT: Okay.

MR. CAVANAUGH: This is the one Mr. Kryzston used earlier, this is the one that's in evidence, this is the one they heard.

MR. DeMASTERS: And that's when we noticed it, Your Honor, is when they were using it earlier with Constable -- with Mr. Markey, that the demonstrative they're using sounds different than that one that we've admitted into evidence.

THE COURT: You have a copy and they have a copy and you're saying they're different?

MR. DeMASTERS: What I'm saying, Your Honor, is the

03:23 demonstrative that we agreed to that he used during the opening statement is the one they're using right now.

THE COURT: Right.

MR. DeMASTERS: That's the demonstrative. We also agreed to put into evidence the body camera videos, which is what's not being used right now which we --

THE COURT: Are you talking about the separate ones?

MR. DeMASTERS: Well, it's essentially almost the same, except it seems like that you can hear better on the actual exhibit that's been admitted into evidence versus the demonstrative, and we'd just prefer them to use the one that's been admitted into evidence.

THE COURT: I'm lost.

MR. CAVANAUGH: Your Honor, quite frankly I'm lost too. We listened to this same thing earlier with Constable Markey. It is my understanding this is the exhibit that was admitted into evidence. We consented to this earlier. The jury has heard this multiple times. They heard it in Mr. Kryzston's opening and they also heard it when Constable Markey was on the stand. And I understand he's just now realizing it or thinks so, but this is what we consented to. I'm not exactly sure, what's the difference?

THE COURT: Do you have one that you think you can hear it better on?

MR. DeMASTERS: It's the same one they provided us.

03:24 It's just, this is the demonstrative. They provided two videos to us. The body camera videos they intended to offer into evidence we agreed to, as well as the demonstrative which they used during their opening, and they're using their demonstrative for opening, they used that with Mr. Markey, and we realized that while he was doing it, they weren't using the one that had actually been placed into evidence, Your Honor, because the demonstrative we never agreed could go into evidence.

THE COURT: So do you have two?

MR. CAVANAUGH: Your Honor, I mean, this is -- I mean, this is the one that we have been using the entire trial --

THE COURT: I know that.

MR. CAVANAUGH: -- that's in evidence.

THE COURT: But was there a different one that you gave to them? Did you give them two? Did you give them one that was demonstrative and one that was in evidence?

MR. CAVANAUGH: Prior to a meet, mark, and exchange last week -- or earlier this week, I'm sorry, Your Honor, we gave them this video and the other video and we told them if there was an issue with this one, to let us know. We consented and we've played it the entire trial.

THE COURT: Well, they consented to it being used for demonstrative purposes, is my understanding. Then when we were here and we went over the exhibits before the trial began and

03:25 we admitted No. 1 for the plaintiffs, that was not the one that -- I don't know if that was the one that was the demonstrative one, because they're saying they were given a different one that has a different audio, a louder audio.

MR. CAVANAUGH: Okay. Well --

THE COURT: I don't think I can solve this problem right now.

MR. CAVANAUGH: I would like to play this for Sergeant Wilkes because it is my belief his voice is on this and he will be able to identify it.

As I take Mr. DeMasters' issue right now, his issue is with the volume, and if there's a way we can improve the volume, I'm fine with that. The jury has heard this multiple times.

THE COURT: Do you have the other one you were provided?

MR. DeMASTERS: We do, yes, Your Honor. They have it as well. They provided it to us. And that's the one we admitted into evidence. This was the demonstrative to be used just for opening. We realized they were using it while they were talking with Constable Markey and that's why we didn't bring it up at that point.

THE COURT: Well, I wish you had brought it up on a break, not in the middle of someone's testimony.

MR. DeMASTERS: I apologize, Your Honor.

03:26

THE COURT: We'll just have -- I mean, they don't have another one apparently. You have the other one. So unless you want to play yours for them.

MR. DeMASTERS: Your Honor, mine is, they provided it to us. They're the ones who had the videos sent, not us.

MR. CAVANAUGH: Your Honor, the only -- I will tell you that the only difference is -- the only difference here is the addition of September 8th, 2019, at the beginning in the dispatch call, and where it says approximately ten minutes later. I mean, I'm happy to turn the screen off so the jury doesn't see those two slides -- don't see those two slides, but they've heard the audio from this call. I would like to play it for Sergeant Wilkes. It is my belief his voice was on it. It is knowledge he had at the time of the incident. And I'm not sure, if the objection is just --

THE COURT: Okay. Have your audio person play the portion that you're talking about right now.

(Pause.)

MR. DeMASTERS: And what I noticed, Your Honor, you know, is that the initial interaction with Ms. Mills sounded muted on their version versus the version that we had agreed to in evidence.

THE COURT: So now it's Ms. Mills talking?

MR. DeMASTERS: Well, it's --

THE COURT: I thought it was the dispatcher.

03:28 MR. DeMASTERS: No, the dispatcher wasn't included as part of this original Exhibit 1.

THE COURT: So -- all right.

MR. DeMASTERS: I'm not trying to waste the Court's time. I apologize.

THE COURT: Okay. Let's just move on. Let's go back and you continue, Mr. Cavanaugh.

MR. DeMASTERS: The distinction, Your Honor, is, I believe, and I don't mean, with all due respect to Mr. Cavanaugh, we don't want theirs to be manipulated more than the one that's in evidence.

THE COURT: You think they have manipulated the video?

MR. DeMASTERS: I don't know that for a fact, Your Honor. I'm just saying the one that's been marked into evidence sounds louder than the one they're using.

MR. CAVANAUGH: Your Honor, can we sidebar a minute, Your Honor?

THE COURT: No.

MR. CAVANAUGH: Okay. You know, we've done nothing to manipulate this video and the suggestion that we have I think is incorrect. There's nothing been manipulated here.

THE COURT: If he thinks it has been, he has a right to play his version during his case.

MR. CAVANAUGH: Okay. Thank you, Your Honor.

MR. DAVIDSON: Thank you, Your Honor.

03:29

THE COURT: All right.

MR. CAVANAUGH: May it please the Court.

THE COURT: Yes.

MR. CAVANAUGH: Go back to the audio, please.

(Audio played.)

BY MR. CAVANAUGH:

Q. Sergeant Wilkes, do you recognize or remember that phone call?

A. The radio call, yes.

Q. Okay. Is that your voice after the dispatcher?

A. Yes, I was 901.

Q. All right. And is it correct to say that the information relayed on that was that you were responding to a welfare check, there was a suspect attacking cars in the middle of the road and asking people to shoot him? Is that correct?

A. Yes.

Q. All right. And then you asked, "How many calls so far," correct?

A. Yes.

Q. And the dispatcher relayed, "Two so far," correct?

A. Yes.

Q. All right. What did you do in response to that call?

A. I'm not sure on the radio, but I'm pretty sure -- I thought I told Kinder, Deputy Kinder, to step it up.

Q. All right. So you told Deputy Kinder -- I believe it's

03:31 904; is that correct?
A. That's right.
Q. That is Deputy Kinder's, what, badge sign or call sign?
A. Call sign.
Q. Call sign.
-- to step it up. What do you mean "step it up"?
A. To like an expedited response, like lights and sirens to get there faster.
Q. All right. And did you in fact at that point -- where were you when you received that call, if you recall?
A. I believe I was on Highway 1, like in the median. I had just left the other call. When I heard the radio, I pulled over to stop to listen to it.
Q. All right. And did you at some point decide to go to the scene yourself?
A. I did.
Q. Okay. Was it immediately afterwards that you decided to go?
A. It was pretty close.
Q. Okay. But at that point you had told Deputy Kinder to go to the scene --
A. Right.
Q. -- correct?
A. Correct.
MR. CAVANAUGH: All right. Let's go to the beginning

03:32 of the bodycam, please, and just stop it at the very beginning, please.

BY MR. CAVANAUGH:

Q. All right. At this point you're not there, correct?

A. Correct, if that's Kinder's bodycam.

Q. This is whose bodycam?

A. I said, if this is Kinder's bodycam, yeah, I wasn't there yet.

Q. Okay. All right. And so you're not there. When this bodycam turns on, you're not there, correct?

A. Right, correct.

MR. CAVANAUGH: All right. Let's fast-forward to the part where Sergeant Wilkes arrives, please.

BY MR. CAVANAUGH:

Q. Sergeant Wilkes, the extent of the knowledge you had going to the scene and the extent of the information in your possession at the time was nothing more than what had been relayed on the dispatch radio to you that the suspect was attack- -- there was a suspect attacking cars in the middle of the road and asking people to shoot him, correct?

A. Right.

Q. And you had no additional information and received no additional information between the time of that dispatch call and the time that you arrived on scene, correct?

A. Correct, I don't believe so.

03:33
Q. All right. Do you recognize the --
MR. CAVANAUGH: I tell you what, Steve, can you go back to the beginning and play from when Mr. -- when Kinder gets on scene, please?
BY MR. CAVANAUGH:
Q. Have you seen Deputy Kinder's video before, body-worn --
A. Yes.
Q. -- camera --
A. I have.
Q. -- before? Okay.
(Video played.)
BY MR. CAVANAUGH:
Q. Were you able to hear Teresa Mills okay in that clip?
A. Yes, on this video clip.
Q. You had no problem hearing Teresa Mills.
A. I did not, no.
Q. All right. But you weren't privy to that information.
A. No, sir.
Q. That was the extent of what Deputy Kinder and Constable Markey saw when they arrived --
(Coughing sound.)
Q. -- on the scene, correct?
A. I'm sorry, could you ask that back?
Q. That's what they saw when they arrived on the scene.
A. Yes, yes.

03:35 MR. CAVANAUGH: All right. Go ahead.
(Video played.)
BY MR. CAVANAUGH:
Q. All right. This is when you arrive on scene, correct?
A. Yes.
Q. And so when you pulled in the neighborhood, did you have your siren on, did you have your lights on, what did you have?
A. Not into the neighborhood. I don't believe I had any sirens or lights on.
Q. All right. So when you pulled in the neighborhood, you just pulled in, your sirens and lights are off --
A. Yes.
Q. -- correct?
A. Correct.
Q. And you park your vehicle very close to where Deputy Kinder's vehicle was, correct?
A. Yes. I don't remember exactly, but yes.
Q. Okay. All right. And did you have any conversations with anybody else between the time you pulled up and got out of the car up until the time we're going to see you interact with Mr. Gagliani?
A. No.
Q. Okay. And you had no additional information at this point, correct?
A. Not at this point, no.

03:36
Q. The only thing you still knew up to this point was only what you had received via the dispatch call, that there was a suspect attacking cars in the middle of the road and asking people to shoot him, correct?
A. Yes.
Q. And that there had been two calls so far, correct?
A. Yes.
MR. CAVANAUGH: All right. Go ahead, sir, please.
(Video continues.)
BY MR. CAVANAUGH:
Q. All right. As you're walking to the scene, could you hear any of the interaction between Mr. Gagliani and Deputy Kinder?
A. When I got closer. I don't remember exactly what point I could hear them, but yes.
Q. Okay. Did you make any observations as you were walking to the scene?
A. As I was walking up?
Q. Yes, sir.
A. I was just making observation where he was at, kind of where people were at. I noticed some kids at a school bus stop as I was walking up.
Q. Okay. You noticed some kids at a school bus stop.
A. Yes, because I was checking around me and everything, like we do.
Q. Okay. All right. So you walk up to the scene. What do

03:37 you observe with Mr. Gagliani? Tell me what you see. We can see it on the bodycam, but what do you see?

A. What did I see when I walked up?

Q. Yes.

A. Just Deputy Kinder interacting with him, speaking with him.

Q. All right. Did he seem to pose a threat at that moment?

A. He didn't seem to, but that doesn't mean he wasn't a threat.

Q. Did you think he was a threat at that moment?

A. Honestly, I have to take everybody as a threat.

Q. Okay. Did you have any reason to believe he was a threat at that moment?

A. Nothing specific like weapons or anything in his hands or anything.

Q. All right. Do you agree with me that he was standing there with only his exercise shorts on, shirtless, and no shoes, correct?

A. Yes, correct.

Q. All right. And so you arrived here. Did you have an opportunity to get a closer observation of Mr. Gagliani at this moment?

A. Yes.

Q. Okay. All right. And you're scanning him, you're looking at him. What are you seeing? What are you looking for?

A. Any signs of weapons or body behavior, stuff like that.

03:38
Q. Did you see any weapons?
A. I couldn't see any -- physically see any weapons, no.
Q. Anything? You didn't see anything?
A. No, no, I didn't.
Q. Okay. All right. And you agree with me that when you walked up to the scene, he did not appear to pose a threat to you or any other officer or any other person on scene, correct?
A. Again, he had no weapons. I can't say he wouldn't be a threat. I mean, it's --
Q. All right. Immediately when you walked up, you disagree with me that when you walked up --
A. I mean, he didn't appear to be a threat if that's what you're asking me.
Q. Okay. At that point he did not appear to be a threat --
A. Right.
Q. -- to himself --
A. Yeah, yeah.
Q. -- or others, correct?
A. At that point, no.

MR. CAVANAUGH: All right. Go ahead, Steve, please.

(Video continues.)

BY MR. CAVANAUGH:
Q. All right. You're observing this whole interaction, correct?
A. Correct.

03:40
Q. All right. And at any point during this interaction with Deputy Kinder, do you observe that Stephen Gagliani is a threat to himself or others?
A. I did have concerns with the way he was answering Deputy Kinder's questions.
Q. What concerns did you have?
A. Just that they weren't really making sense, the responses.
Q. All right. So it wasn't making sense. So did you determine what -- what were your suspicions? What were those concerns?
A. Based on how he was answering questions?
Q. Yes.
A. I mean, that it could have been anything. It could have been a drug-related problem or anything.
Q. He could have been suffering from a mental health crisis, correct?
A. Could have been. I was still trying to formulate what was going on --
Q. Okay. He was just not --
A. -- or calculate.
Q. I'm sorry. I apologize.
A. I was trying to calculate like what's going on, taking all the information in.
Q. All right. And so he was -- in your mind, you were thinking he was either under the influence of something or

03:41 suffering from a mental health crisis, correct?
A. Yes.
Q. Are you supposed to respond differently to either one, if he's either on drugs or suffering from a mental health crisis? Does that change your response at all?
A. It's all situational. A mental health crisis can appear to be the same as being intoxicated on drugs.
Q. I understand.
A. So it's --
Q. I'm just saying on walking up to the scene, seeing Mr. Gagliani --
A. Uh-huh.
Q. -- are you supposed to do anything differently regardless of whether you thought he was suffering from a mental health crisis and the outward expressions he was making, the things he was doing, are you supposed to do anything different in your response to that scene?
A. Not at that point, no.
Q. Okay.
A. No.
Q. All right. So at this point he's not a threat, he'd not made a threatening move, correct?
A. Correct.
Q. He'd not done anything, correct?
A. While I've --

03:42
Q. He'd not done anything.
A. -- been there?
Q. He was standing still. I'm sorry.
A. Yes, correct. While I was there, you mean?
Q. Yes.
A. Yes, correct.
Q. You did not observe him make a move.
A. Correct.
Q. You did not observe him use threatening language, correct?
A. Yes.
Q. You did not observe him go for a weapon, correct?
A. Yes, correct.
Q. You didn't see a weapon, correct?
A. Correct.
Q. You didn't perceive him as a threat at this moment, correct?
A. Not at that exact moment an active threat, no.
Q. Not at this moment.
A. Right.
Q. At this moment you don't perceive him as a threat --
A. Right.
Q. -- correct?
A. Correct.
Q. All right. You're just worried about him because he's, what -- you'd received this information that he had earlier

03:43 been jumping around in the street asking people to shoot him, correct, and you see this interaction with Deputy Kinder where he's not answering questions correctly? Correct?
A. Concerns for him at the time, yes, correct.
Q. Right. That's all the information you have, correct?
A. Correct.
Q. All right. And you don't perceive him as a threat at this moment.
A. Not at that moment.
Q. To yourself, to Deputy Kinder, or to others, correct?
A. I couldn't say to himself or not because we were still talking to him, but I didn't see him as an active threat to me at that current time.
Q. All right. You didn't see him as a threat, correct?
A. To me right then.
Q. All right.
(Video continues.)
Q. All right. Deputy Kinder walked away, correct?
A. Yes.
Q. You're the supervising officer on scene, correct?
A. Yes, correct.
Q. All right. So when you got there, it's absolutely clear Deputy Kinder and State Constable Markey understands that you're in charge, correct?
A. Yes, I would think so.

03:44
Q. All right. So you're making the decisions and the calls from here forward, correct?
A. Yes.
Q. All right. And so you're standing off to the side, we see it in the bottom bodycam.
A. Uh-huh.
Q. Okay. You've agreed with me he's not a threat. He hasn't done anything, he doesn't have a weapon, there's nothing going on, and he's standing there. You agree with that, right? He's just standing there not answering questions correctly, confused, correct?
A. At that current time --
Q. At that current time.
A. -- that is true.
Q. Correct. Is that right?
A. Yes, yes.
Q. Okay. And in fact, if you had that concern and Deputy Kinder said, "I'm going to walk away from the scene," you would have stopped him, right?
A. Yes.
Q. And you would have said, "Hold on, hold on, don't go anywhere," right?
A. Yes.
Q. But you didn't do that. You let him walk away, correct?
A. In that moment I did.

03:45

Q. To go talk to other people -- other people and see what's going on, correct?
A. In that moment I --
Q. To try --
A. -- did, yes.
Q. -- to gain more information, right?
A. Yes.
MR. DeMASTERS: Let him answer the question.
THE COURT: Yeah, don't interrupt his answers.
MR. CAVANAUGH: I apologize, Your Honor.
BY MR. CAVANAUGH:
Q. All right. Deputy Kinder walks away, you walk up and you ask him for his ID, correct?
A. Yes.
Q. His state-issued ID, correct?
A. Yes, correct.
Q. And his response was?
A. I can't remember if it was what's -- "What ID" or something like that.
Q. I don't want to put words in your mouth.
MR. CAVANAUGH: Go back.
(Video rewound and played.)
BY MR. CAVANAUGH:
Q. All right. His response was what? Could you hear it?
A. I think the first time he said, "What ID?" I didn't hear

03:46 the second response.

Q. Yeah. "What ID," right?

A. Yes.

Q. And so was there anything about that that made it seem like he was threatening in any way?

A. Well, at that point I was able to actually see his eyes.

Q. Okay.

A. So I was taking in information at that time and at that point, so I was considering everything, so if you're asking me like immediately right then did I think he was a threat, is that what you asked?

Q. Yes.

A. I started leaning towards that, yes, absolutely.

Q. All right. The extent of your knowledge up to this point we agree was what you knew from the dispatch call --

A. Right.

Q. -- correct?

A. Right.

Q. And what you had observed.

A. Correct.

Q. Right. And you agree with me, looking at this video, correct, that Mr. Gagliani, while he might have been in the street earlier, correct, you didn't see that -- you didn't see that, correct?

A. No, I didn't see that.

03:47

Q. All right.
A. No.
Q. And defense counsel earlier yesterday played a surveillance video. You didn't see that video, did you?
A. No, I didn't see that video --
Q. You didn't --
A. -- before --
Q. -- know the extent of what he was doing, correct?
A. Correct.
Q. All right. And in fact, all you knew was the dispatch call, correct?
A. Yes.
Q. All right. And you see in the video where Mr. Gagliani went back inside, correct?
A. In the video, yes.
Q. Right. And they brought him back outside, correct? He had -- he had --
A. Yes, yes.
Q. -- retreated into his home.
A. Yes, uh-huh.
Q. Right. All right. And then he came back outside willingly, correct?
A. Yes.
Q. All right. At this point you're engaging with him. You've sent Deputy Kinder off. Correct?

03:47
A. I didn't send him off.
Q. Well, excuse me. He walked off, correct?
A. Right.
Q. All right. You felt safe enough and okay enough, like there was no threat, or else you wouldn't have let Deputy Kinder walk away, correct? You've agreed with that already.
A. Yes.
Q. All right. But then you come up and you start engaging with him and he gives you more confused answers, correct?
A. Correct.
Q. All right. And at this point you say you see his pupils, correct?
A. Yes.
Q. For the first time?
A. Yes.
Q. All right. And is that when you determined that he was a threat?
A. Well, taking in everything that we had, yes. I was worried about the schoolkids, I was worried about people in the neighborhood, and yes, at that point I decided it was more than likely could be a threat.
Q. But physically, had he done anything? Had you seen him do anything?
A. No, not physically.
Q. Had he moved towards you?

03:48
A. Not at that point.
Q. Okay. Had he reached out and tried to grab you?
A. Not at that point.
Q. Did he ever reach out and try to grab you before we're getting ready to see what you ended up doing?
A. At this point --
Q. Yes.
A. No.
Q. He did not.
A. No.
Q. Okay. Had he done anything that seemed threatening at all?
A. Not physically, no --
Q. He just --
A. -- not at this point.
Q. -- seemed confused, correct?
A. He was given --
Q. He was giving --
A. You might call it confused. I was concerned about being intoxicated.

THE COURT: Mr. Coffman -- Cavanaugh, I'm sorry --

MR. CAVANAUGH: I don't mean --

THE COURT: I keep saying Coffman.

MR. CAVANAUGH: That's okay. I apologize, Your Honor, I don't mean to talk over.

THE COURT: You've got to let him finish his answers.

03:49 MR. CAVANAUGH: I apologize, Your Honor.
THE COURT: All right.
BY MR. CAVANAUGH:
Q. I apologize to you too. I need to let you finish. I apologize for that.
We agree that at this point you've reviewed the bodycam video, okay?
A. Uh-huh.
Q. Mr. Gagliani is calm, correct?
A. He does appear calm, yes.
Q. Speaking calmly.
A. Yes.
Q. Not making any outward manifestations of -- or threats, correct?
A. Right, correct.
Q. That you can see?
A. Right.
Q. And you didn't see any in this vid- -- in this body -- in the body-worn cam that Deputy Kinder --
A. No.
Q. -- of Deputy Kinder's, correct?
A. Correct.
Q. All right. And so he's done nothing. Not threatening, nothing. You get up, you look at him, and you decide what?
A. It appeared to me that he was possibly under an influence

03:49 of narcotics.
Q. But he also -- why?
A. Due to his pinpoint pupils and his behavior, his answers to the questions.
Q. All right. People can have pinpoint pupils for a host of different reasons.
A. Oh, absolutely, yes.
Q. Okay. All right. People can be confused for a host of different reasons, correct?
A. Correct.
Q. All right. And that isn't necessarily in and of itself justification to detain someone, is it?
A. Not if you take each piece separately, absolutely.
Q. Okay. All right. But you had seen no reason, he had not exhibited any threatening behavior, had no weapons, did not move towards you, didn't move towards Constable Markey, didn't move towards Deputy Kinder. In fact, Deputy Kinder felt safe enough to walk away, correct?
A. Yes.
Q. All right. You get up, you start interacting, nothing really changes, does it, in his actions, correct?
A. Correct.
Q. All right. You see -- and you see his eyes and what do you then determine?
A. I determine that he's possibly a threat --

03:51
Q. Okay. Why?
A. -- to either himself or us or others.
Q. Why?
A. Because of his answers to the questions, the pinpoint pupils, his thousand-yard stare that he had when he looked at me, and my experience as an officer.
Q. What about the evasive -- or excuse me, the confusing answers made him a threat?
A. Well, that in and of itself didn't make him a threatening -- or a threat --
Q. Right, but was --
A. -- but everything together, each piece together --
Q. I understand that.
A. -- made me have concern for it.
Q. I understand that. But you agree with me that his answers to the questions were just simply exhibiting some confusion, correct?
A. Yes.
Q. All right. And that in and of itself could have been signs of someone not understanding your question, confused, suffering from a mental health crisis, right?
A. Yes.
Q. And if he was in fact suffering from a mental health crisis, you're taught to de-escalate, right?
A. Yes.

03:52
Q. All right. But this situation is not escalated, is it?
A. No.
Q. He's calm.
A. Yes.
Q. He's doing nothing, right?
A. At this point, no.
Q. Just not answering your questions like you or I might expect somebody to answer the questions, correct?
A. Correct.
Q. And so you walk up. You end up asking him, Let me see your ID. He gives another evasive answer or confused answer, What ID? You say, Your South Carolina or other ID, correct, state-issued ID --
A. Yes.
Q. -- correct?
A. Correct.
Q. All right. Did he say anything else at that point?
A. I don't think so.
Q. Did he make any movements?
A. Right at that point, no.
Q. Did he reach out to grab you?
A. No.
Q. But you instead decide to detain him at that moment, right?
A. Yes.
Q. All right. Why?

03:53
A. Like I just explained, it was the totality of everything going on: The fact that we were there when the school buses were running, his behaviors, the previous -- the calls we had about him. So it wasn't one specific thing that made me say he might be a threat and needs to be detained, it was everything together.
Q. So there was a tipping point for you, correct?
A. Yes.
Q. So up to the point that you actually saw his pinpoint pupils and are in front of him, nothing had changed, everything was status quo, you're dealing with a guy in shorts, barefoot, no shirt, right?
A. Right.
Q. Nothing had changed. You get in front of him and something breaks, something tips the scales for you, right?
A. Correct.
Q. All right. And it wasn't him raising his voice.
A. No.
Q. It wasn't him trying to run.
A. No.
Q. It wasn't him making a threat.
A. No.
Q. It wasn't him reach out and try to grab you, was it?
A. No.
Q. He didn't do anything different.

03:54

A. Right.
Q. He just looked at you funny.
A. He didn't look at me funny. I mean, we might have a difference of describing that. He wasn't looking at me funny. It was a thousand-yard stare.
Q. The thousand-yard stare.
A. The thousand-yard stare, correct.
Q. Okay. What is "the thousand-yard stare"?
A. So it's basically a term for somebody who is like looking at you, but they're not really physically seeing you, so they're looking through you almost and they're looking off into the distance although you're standing there interacting with them.
Q. Is that something you're trained on?
A. No. It's from experience, law enforcement and military.
Q. It's from experience.
A. Right.
Q. Law enforcement and military.
A. Yes.
Q. Can you show it to me?
A. No, I cannot. It's not a forced action.
Q. You can't. What is it? Looking straight ahead beyond you?
A. It's not -- like I said, it's not a forced action so I can't demonstrate it to you or really explain it thoroughly to you, it's just something you learn with experience --

03:55
Q. The thousand-yard stare --
A. -- with a little more experience --
Q. -- what does that mean? What does it mean, the thousand-yard stare?
A. That someone is looking at you but they're not seeing you, they're looking through you almost, but they're not comprehending that somebody is standing in front of them.
Q. And that was threatening to you, the fact that he was looking beyond you.
A. Everything together.
Q. That tipped the scales for you, though.
A. But I was -- everything before that was already in my head. It's not like I just learned it when I walked up to him.
Q. It's not something that you are trained on.
A. No.
Q. Correct?
A. Correct.
Q. It's not something that I could recognize, correct?
A. I wouldn't think so, but I'm not --
Q. It's not something you can duplicate.
A. Correct.
Q. And you can't show this jury what it is either, can you?
A. It's not a forced action, no, I couldn't.
Q. And we can't even see it in this video, can we?
A. No, it doesn't look like it.

03:55

Q. But then you decide, because he gives something that nobody knows except for you in your knowledge and experience as a law enforcement officer, you can't duplicate, you can't show the jury what it is, and that's it, right, that's it, that's the tipping point? He didn't do anything. He didn't move towards you.
A. Right.
Q. He didn't whip out a knife.
A. Right.
Q. He didn't stick his hands down his pants like he was going for something.
A. Right.
Q. He didn't step. He didn't do anything. He just looked at you funny and that was it.
A. So you keep saying look at me funny. It wasn't that he looked at me funny, it was the look that I've recognized before, like I can attack you, like somebody was about to do something. So before he could reach into his pants and pull something out, before he could run out into the street or anything, I decided that, yes, we needed to detain him to contain him so that that wasn't a possibility.
Q. Aren't you taught to -- aren't you supposed to advise him that you're going to detain him?
A. In my experience, sometimes if you advise somebody you're going to detain them, it makes them react badly.

03:57
Q. And this knowledge that you're telling me that you had, right, is everything, right? It's what you knew from the call, right?
A. Yes.
Q. And what happened with Deputy Kinder and Constable Markey, correct?
A. Yes.
Q. A totality of those things, correct?
A. Correct.
Q. All right. And so you knew -- or you all knew that this is a guy who had walked outside and calmly said, Hey, take me to jail.
A. I didn't know he said, Take me to jail.
Q. You didn't. But you're considering it. It's within your -- within your knowledge, correct?
A. At the time it wasn't.
Q. It wasn't.
A. No.
Q. So you didn't know any of that.
A. Right.
Q. You made the decision -- the only thing you knew was what came out of that dispatch call --
A. Uh-huh.
Q. -- what you listened to him say, which was confusing, and the fact that he gave you some stare, which you can't tell

03:58 anybody what it is or duplicate it or that you got trained on it, and that made you think, I don't even need to tell this guy that I'm about to detain him.
A. You're leaving out one important fact.
Q. What is that?
A. And that's the fact of the schoolkids. That was on top of my priority list, those kids across the street at a school bus stop, okay? So it wasn't that I wasn't concerned about everybody, I wasn't concerned about him, I wasn't concerned about Kinder, I wasn't concerned about Markey, I was concerned about everybody, but those kids were on top of my mind too.
Q. Why didn't you just say to him, Sergeant Wilkes, "Sir, you're not making any sense"? Why didn't you -- if you felt like he was going to dash at you or go at you or go at somebody, right -- because he didn't make any moves, correct?
A. Right.
Q. We agree with that.
A. Yes.
Q. And he didn't reach out, and he didn't reach in his pants, and he didn't -- he didn't do anything. If you felt like he was going to do something, why didn't you just step back and say, "Sir, we're worried about you. We want to get you some help"?
A. Because if I felt like he was going to do something, that wouldn't be a great idea to step back.

03:59
Q. Okay. Well --
A. I mean, it wouldn't be.
Q. -- why didn't you just stand there?
A. It wouldn't be a great idea not to react at that point as a law enforcement officer. If I made -- if I -- once I made that decision, taking everything into account, it -- I felt it would not be prudent.
Q. How many officers were there with you at the time?
THE COURT: Mr. Cavanaugh, we're going to break now for our afternoon --
MR. CAVANAUGH: We're going to break?
THE COURT: Yes. Ladies and gentlemen of the jury, we're going to take our afternoon break now. You may leave your pads in your seats. Do not discuss the case while you're on break. We'll take ten minutes.
Mr. Wilkes, you can step down during the break as well. Just don't discuss your testimony with anyone.
THE WITNESS: Yes, Your Honor.
THE COURT: Okay.
THE WITNESS: Your Honor, just come straight back up when I come back?
THE COURT: Yes.
MR. DAVIDSON: Your Honor, can we let Officer Thomas go until in the morning?
THE COURT: Just one moment.

04:00 (Jury not present.)

THE COURT: How much longer are you going to have this officer on the stand?

MR. CAVANAUGH: I apologize, Your Honor, I took all time devices off of me.

THE COURT: Are you going through the whole event all the way to the end?

MR. CAVANAUGH: Yes, Your Honor, because there's some very critical testimony in there. It's 4:00 right now? I doubt we'll get done.

THE COURT: All right. You can release Thomas until tomorrow.

MR. DAVIDSON: Thank you.

THE COURT: All right.

MR. DAVIDSON: What time do you all want him here tomorrow or do you all have a time?

MR. CAVANAUGH: If we finish with him today, which I would suspect we would, my suggestion would be to have him here first thing and we'll put him on the stand first thing.

MR. DAVIDSON: Okay, that would be fine. I just didn't want to run into a problem that you all then decide to put --

MR. CAVANAUGH: No, no, no, no. If you're going to have him here, I'll put him on first, okay?

MR. DAVIDSON: Okay. That will work.

04:01

THE COURT: All right. Take ten minutes.

MR. DAVIDSON: Thank you, Your Honor.

(Recess, 4:01 p.m. to 4:13 p.m.)

THE COURT: All right. Mr. Cavanaugh, before we bring the jury back in, you are being very repetitive --

MR. CAVANAUGH: I understand, Your Honor.

THE COURT: -- and you need to stop.

MR. CAVANAUGH: I understand, Your Honor.

THE COURT: Okay. All right. You may bring the jury in. Please bring the jury in. Thank you.

(Jury Present.)

THE COURT: Thank you, everyone. You may have a seat.

All right. You may continue.

MR. CAVANAUGH: May it please the Court, Your Honor.

THE COURT: Yes.

BY MR. CAVANAUGH:

Q. Sergeant Wilkes, I think we've established that Mr. Gagliani was not an immediate threat so we're going to move on, okay? I want to play the video from this point forward.

(Video continues.)

Q. At this point you have reached out and grabbed Mr. Gagliani to detain him, correct?

A. I was trying to secure his hand, yeah.

Q. And you were trying to secure his hand in what way? What were you trying to do? Were you trying to handcuff him?

04:16

A. Ultimately I was going to handcuff him, yes.
Q. Okay. And you went to him, you're on one side, correct?
A. Correct.
Q. You go around the right side of his body, correct?
A. Of his body?
Q. Left side --
A. Left side.
Q. -- of his body.
A. Yes.
Q. I'm sorry. I apologize.
Deputy Kinder comes around the right side of his body, correct?
A. Yes.
Q. All right. And Constable Markey is standing off to the side, correct?
A. Yes.
Q. All right. You go to try to detain him to get him in cuffs and what happens?
A. He started physically resisting us.
MR. CAVANAUGH: I forgot this, I apologize. I apologize.
A. He started physically resisting us.
BY MR. CAVANAUGH:
Q. Okay. And when you say "physically resisting," what do you mean?

04:16

A. Like he was pulling his arms away, he was using his body weight to kind of push us around.

Q. He was refusing to be handcuffed, correct?

A. Yes.

Q. At this point, had you -- when you went up to try to grab him to detain him, had you advised him that you were trying to help him?

A. I did not.

Q. Okay. So at this point you just went to grab him and tried to handcuff him. He basically would not release his arms such that you could and he was resisting being handcuffed, correct?

A. Yes.

Q. Okay.

(Video continues.)

Q. Now, is that when your bodycam fell off?

A. It was knocked off, yeah. It was knocked off.

Q. It was knocked off --

A. Yes.

Q. -- during your attempts to handcuff Mr. Gagliani, correct?

A. Yes.

Q. All right.

(Video continues.)

Q. All right. Is that your voice or Deputy Kinder's voice?

A. Which one, the last, the very last one?

Q. "You're about to get tased."

04:18
A. I believe that was Deputy Kinder.
Q. All right. So at this point you had moved in, you had put his hands behind his back, he had resisted getting handcuffed, all right, and the next thing that happens is Deputy Kinder tells him, "You're about to get tased," correct?
A. Well, he was physically resisting us. It wasn't like that was -- that was it, it went straight to the TASER, no.
Q. No, no, I understand and I appreciate that, but at this point we can't see what happens --
A. Right.
Q. -- because the bodycam footage is gone --
A. Right.
Q. -- correct? Because your bodycam footage has -- your bodycam has gotten knocked off, and Deputy Kinder's has either gotten knocked off or shut off at this moment --
A. Right.
Q. -- correct? All right. And the struggle is trying to get his hands behind his back and the handcuffs on him, and he's resisting that, and the next thing we hear is Deputy Kinder say, "You're about to get tased," right?
A. That's the next thing you hear, yes.
Q. And is it your belief that that would have been appropriate, to tase him at that moment?
A. When he was physically resisting us? Yes.
Q. When he's resisting being handcuffed, would it have been

04:19
appropriate, based on your training -- based on your training --
A. So --
Q. -- to tase him?
A. -- yes, because I think you're confusing -- like it wasn't like he just stood there and didn't pull his arms back. He was physically resisting us.
Q. What do you mean by "physically resisting"?
A. Using his body weight. He almost threw me around with his arm a couple of times, on one arm.
Q. Has he like got his hands like this and he's shaking like this --
A. No.
Q. -- sort of (demonstrating throughout)?
A. He's moving me. He's pushing against us, yes.
Q. So he's resisting being handcuffed, correct?
A. He's resisting, yes.
Q. Physically resisting being handcuffed.
A. Physically resisting.
Q. I just want to make sure I understand what you're --
A. Okay.
Q. -- saying because we can't see it. Like we can --
A. No, I gotcha.
Q. -- see a lot, but we just can't see that, okay?
And then you hear Deputy Kinder say he's going to be

04:20
tased --
A. Yes.
Q. -- right?
(Video continues.)
Q. All right. So we've moved on a little bit further in the video, okay?
A. Uh-huh.
Q. And the only thing we're hearing, because we're really not seeing anything, is, Put your hands behind your back, put your hands behind your back, put your hands behind your back, correct?
A. Yes.
Q. And is he doing anything else at this point other than what we've already discussed as far as resisting, resisting being handcuffed and sort of moving around?
A. I can't remember at this point if we were on the ground or not, but it was continuous what you were talking about, so...
Q. I understand. I just --
A. Yeah, I don't know -- like I'm not -- I'm just trying not to speak out of turn, and I don't know what exact point it's at right there, but yes.
Q. Yes, sir. And the only reason I'm asking some of this is because we can't see it and I'm trying to understand from -- we can hear, but not see.
A. I gotcha.

04:21
Q. Fortunately we can see most of this, but there are points we can't.
A. Right.
Q. And so that's why I'm asking now, what do you recall him doing at this point --
A. Right.
Q. -- okay? All right. And so you don't know if you're on the ground at this point, correct?
A. Yeah, I can't -- can't remember that --
Q. So at --
A. -- at this point.
Q. -- some point you go to the ground.
A. Yes.
Q. Okay. And I'm going to fast-forward a little bit. You actually go to the ground twice, right? Is that what I understand --
A. Yes.
Q. -- happened with the struggle?
A. Yes.
Q. Okay. You go to the ground initially.
A. Right.
Q. And then at some point he gets back up.
A. Yes.
Q. And then you go to the ground again.
A. Yes.

04:21
Q. Okay. I just want to make sure, do you know how he ended up on the ground if this is in fact when it occurred this first time?
A. I believe the first time I went to the -- to the ground was actually -- like I say, he was using his body weight and I -- but I can't remember if our feet got tangled up or if he kinda had leaned over towards that direction I was on and we stumbled over each other, I don't know --
Q. Okay.
A. -- exactly.
Q. All right. And at this point you had not offered to help him.
A. No.
Q. You had not told him he's being detained for his own health and safety, correct?
A. Not at this point, no.
Q. The only thing that's being said to him is, Put your hands behind your back.
A. Right.
Q. All right. Did you have a reason to arrest him?
A. At this point?
Q. Uh-huh.
A. No.
Q. You did not, okay.
(Video continues.)

04:22
Q. All right. What was that? What just happened? What was that noise, that click we just heard, that pop?
A. I just heard the beep from the bodycam. I'm not sure if you want to play it back so I can hear it again.
(Video rewound and played.)
A. That was, I don't know, the body camera got knocked -- someone --
Q. Okay. I just want to --
A. Yeah.
Q. -- make sure I understand what it is.
A. Yeah.
Q. Okay? And so who is this up in the top video? This is Deputy Kinder's camera. Is that you or do you recognize who that is that we can see?
A. I believe that would have been Deputy Kinder.
Q. That would be Deputy Kinder. This is Deputy Kinder's bodycam.
A. Right.
Q. So -- oh, Deputy Kinder's bodycam falls off and sort of starts recording up.
A. So the bodycam works also by the TASER, so when you get your TASER activated, the bodycams will turn on.
Q. All right.
A. All the bodycams around you will turn on.
Q. All right. So I just want to understand. So this -- we

04:23 heard earlier here the TASER, what is that, charging?
A. Charging? What --
Q. Was there a charging noise? What --
A. The beep --
Q. -- caused the body- --
A. The beeping noise, is that what you're talking about?
Q. No. The bodycam fell off and went off, and then it comes back on, and you're telling me that the TASER activates the bodycam --
A. Yeah.
Q. -- correct?
A. But the TASER doesn't make a noise when you turn it on.
Q. Okay. I just --
A. Yeah.
Q. -- want to --
A. Yeah.
Q. -- understand why the body -- why the body --
A. Right.
Q. -- cameras come back on.
A. Yeah, they're connected wirelessly --
Q. Okay.
A. -- basically.
Q. Fair enough.
(Video continues.)
Q. All right. What's going on here, Sergeant Wilkes? Is

04:24 he -- are you all on the ground?

A. We're both on the ground at that point --

Q. All right. And --

A. -- me and Mr. Gagliani.

Q. I apologize. You're both on the ground. It seems, I want to say, fairly calm. There doesn't seem to be any struggling going on that we can see, correct?

A. I wouldn't define it as calm.

Q. Okay. But at this point you all are on the ground.

A. Yes.

Q. Mr. Gagliani's on the ground.

A. Me and Mr. Gagliani, yes.

Q. You and Mr. Gagliani are on the ground.

A. Correct.

Q. Okay. All right. And again I think we heard somebody say, We're going to tase you.

A. Right.

Q. And he said what?

A. "Go for it."

Q. Okay.

(Video continues.)

Q. All right. You're still on the ground.

A. Right.

Q. Deputy Kinder obviously is standing up.

A. Right.

04:25
Q. You're on the ground with him. Deputy Kinder we hear say, I'm going to give you one last chance to put your hands behind your back.
A. Right.
Q. If you don't, you're going to get tased.
A. Yes, that's what he said.
Q. All right. And so the use of the TASER, what Deputy Kinder was saying was, If you don't put your hands behind your back so that we can cuff you, we're going to tase you.
A. I'm not sure exactly what Deputy Kinder said at that point because I'm not -- I wasn't looking from Deputy Kinder's vantage point.
Q. All right. I understand, but I'm just asking what you hear, correct? Is that what you --
A. I heard him say, You're going to get tased or -- paraphrasing, but yes.
Q. Okay. But you're hearing this going on, correct? You're in control of the scene. You're the sergeant, correct?
A. You mean the day of the incident.
Q. Yes, sir.
A. Yes.
Q. All right. Why didn't you say, "No, don't tase him"?
A. I actually did, I believe, say hold off.
Q. At this point.
A. Not at this point.

04:26

Q. Not at this point.

A. Yeah.

Q. So at this point Deputy Kinder is saying, Put your hands behind your back or you're going to be tased.

A. Right.

Q. Why didn't you say, "No, hold on, let's see if we can get him cuffed"? Or, "No, it's not appropriate to tase someone just for resisting being handcuffed"?

A. So when Mr. Gagliani and I were on the ground, it wasn't like I just sit down, let's hang out. He was still -- I was still actively trying to control him. It might not have been the same physical as far as like pushing, you know, knocking me down, because we were already down, so I wouldn't say not to tase him because he wasn't just passively sitting there, if that makes sense.

Q. At this point, why didn't you say to him, Mr. Gagliani -- or "Sir, we're trying to help you"?

A. I'm not sure why I didn't say that at that point.

Q. Okay. Is it appropriate to tase him at this moment for simply resisting being handcuffed?

A. I don't know if that's what he was doing at that moment. That's what I'm trying to say, I don't know what Deputy Kinder was seeing --

Q. You're --

A. -- at this point.

04:27
Q. Okay. You're on the ground.
A. Right.
Q. You don't know what he's doing because you can't see it and you don't --
A. Right.
Q. -- recall it. Is that correct?
A. Me and Mr. Gagliani were side by side, and I think Deputy Kinder was somewhere on the opposite side from me, I believe, but I'm not sure.
Q. Okay.
(Video continues.)
Q. Is that you saying, "Let go of my hand"?
A. Yes.
Q. Okay. And is that because you all were struggling on the ground and he had a hold of your hand? Is that correct?
A. He had a hold of my hand, yes.
Q. All right. And he did ultimately let go of your hand, correct?
A. After bending it back, yes.
Q. Okay. All right. And then the next thing we hear is Deputy Kinder's TASER, correct?
A. Yes.
Q. Okay. And what happened to you? Did you roll off? He let go of your hand and you rolled off him? Do you remember?
A. I don't know if I rolled off, but I know I -- I know once

04:28 he -- my hand was in excruciating pain --
Q. I understand.
A. -- when he -- when he had it, so it wasn't like I just -- I don't know if I rolled off, if I was pulling my hand out from his hand, I don't remember exactly when he was tased. I was trying to get away so that Deputy Kinder could use his TASER, absolutely.
Q. Because you didn't want to be shot with the TASER, correct?
A. Correct.
Q. All right.
A. It would have been counterproductive.
(Video continues.)
Q. All right. At this point he's risen up off the ground, he's been tased, correct?
A. Correct.
Q. He's risen up off the ground, he's on all fours, correct?
A. At this point right here --
Q. Yes.
A. -- or you talking about before?
Q. He's on all fours.
A. He was -- he was --
Q. Do you need to see it again to show that he's on all fours?
A. He was getting up.
Q. Okay.
A. I was watching him from behind. He was getting up --

04:29

Q. Okay.
A. -- but if you want to say all fours, he did have his hand planted --
Q. Right. He had his feet --
A. -- and his feet down, yes.
Q. -- on the ground --
A. Yes.
Q. -- and he was on his hands, correct?
A. Yes.
Q. All right. And then somebody comes in and jumps on his back, it looks --
A. Yes.
Q. -- like. Is that correct? Is that you?
A. That's me.
Q. Okay. Why did you jump on his back?
A. Because he was trying to get back up after that tasing and I was trying to make sure that we kind of kept him down so that we can get him detained.
Q. All right. We're a good couple of minutes into this right now, okay?
A. Uh-huh.
Q. A couple of minutes into this. We haven't heard you say one time, "Sir, we're trying to help you."
A. You actually passed over it.
Q. Did I say it -- did I pass it?

04:30
A. You actually passed over it.
Q. Okay.
A. Yeah. When I told Kinder to hold off --
Q. You told Kinder to hold off.
A. Yes.
Q. And --
A. -- I was actually trying to speak to him and say, Hey, we're just trying to get you help.
Q. Did --
A. We just want to get you help.
Q. Did you say that or you were telling Kinder to wait and you didn't get an opportunity to say it?
A. I said it.
Q. Okay. All right.
(Video continues.)
Q. "You're going to get hit again." Was that you or Kinder?
A. I really don't remember and I couldn't tell.
Q. Okay. At this point you're on the ground with him or standing up next to him?
A. I can't recall if we're up at that point or not.
Q. Okay.
(Video continues.)
Q. All right. Who is telling him, who do we hear saying, "You're under arrest"?
A. That was my voice. That was me.

04:32

Q. Okay. Was he -- had he done something for you to arrest him at that point for public disorderly conduct?
A. Well, I don't remember actually saying public disorderly conduct, but he -- he did -- he assaulted me.
Q. He assaulted you.
A. Absolutely.
Q. All right. Okay. And so you just -- you had a reason to arrest him at that point, but the reason that you espoused is incorrect, right?
A. Yes. And I never actually intended to arrest Mr. Gagliani. It wasn't our intent.
Q. You never intended to arrest him --
A. No.
Q. -- correct?
A. Correct.
Q. All right. But is it your testimony that you had a reason to arrest him.
A. Yes. Looking back now, yes, absolutely.
Q. Okay.

MR. CAVANAUGH: All right. Go ahead, please, Mr. Kryzston.

(Video continues.)

BY MR. CAVANAUGH:
Q. All right. Where is Mr. Gagliani right now?
A. Standing up.

04:33
Q. All right. Where is -- where are -- who is this that we see in the upper camera with sort of the light on him?
A. I believe that was Deputy Kinder.
Q. All right. And where are you at this moment?
A. I think on the opposite side.
Q. You're on the opposite side. And then where is Constable Markey at this point?
A. I'm not sure.
Q. All right. And did -- where are your backs? Are you closer to the street or closer to the house?
A. I think we're getting closer to the street --
Q. You're closer to --
A. -- at that point.
Q. -- the street. And Mr. Gagliani is standing up over here with this pointer at him -- on him, correct, in the top right-hand --
A. Yes.
Q. -- corner? All right. And what is he doing? What does the video show he's doing? What is he doing?
A. It appears like he's standing there.
Q. All right.
A. But that's not what I saw.
Q. That's not what you saw.
A. Right.
Q. What did you see?

04:35
A. So what I saw, I believe at this point he had turned towards me and his hand was starting to ball up --
Q. At this point --
A. -- but --
Q. -- you saw -- what you saw here is he had turned towards you and his --
A. Right.
Q. -- hand was starting to raise up, correct?
A. Not raise up, ball up.
Q. To ball up.
A. Yeah.
Q. Okay. Previously in this courtroom we heard Constable Markey talk about a statement he had given.
A. Uh-huh.
Q. Do you recall that testimony?
A. Yes.
Q. Did you also give a statement?
A. I did.
Q. All right. Do you recall what you told SLED in that statement?
A. Not exactly word for word but, I mean, I recall the statement.
Q. Did you tell SLED that -- at this point that he had balled his fist up?
A. At what point? I mean, I have the video with SLED so I

04:36 don't know --
Q. Right. But that's what you recall, correct?
A. Yes.
Q. At the time.
A. Yeah.
Q. You thought that he balled his fist. That's what you saw.
A. Looking back now, yes. I'm not sure at the time I told SLED.
Q. Do you recall at any time stating that "as he advanced towards me"?
A. Yes.
Q. All right. Is that what you in fact told SLED about this particular sequence?
A. I'm not sure.
Q. All right. You don't recall that.
A. I don't recall, no.
Q. Would showing you your statement help refresh --
A. Sure.
Q. -- your recollection?
A. Yes.

MR. CAVANAUGH: May I approach, Your Honor?

THE COURT: Yes.

A. Which part? That wasn't at this point.
BY MR. CAVANAUGH:
Q. That was not at this point.

04:37
A. No, sir.
Q. Okay. That was a different point.
A. Yes, sir, that was before my TASER.
Q. Later on.
A. Yes.
Q. Okay.
MR. CAVANAUGH: All right. Go ahead.
(Video continues.)
BY MR. CAVANAUGH:
Q. Who deployed that TASER?
A. I believe that must have been me if that's Kinder on the --
Q. Was that the first or second time you deployed your TASER?
A. I believe it was the first, but I'm not sure.
Q. Could it have been the second?
A. Like I say, I believe it was the first, but I'm not sure.
Q. All right. We'll see in just a minute. Okay.
(Video continues.)
Q. Who is that telling him to get on the ground?
A. It sounded like Deputy Kinder.
Q. Kinder? Okay. So he's standing up at this moment.
A. Yes, he must have been.
Q. Okay. All right.
(Video continues.)
Q. What is that noise?
A. That beeping noise?

04:39
Q. Uh-huh.
A. The camera beeps every so often. I can't remember if it's 30 seconds or a minute. It makes a noise so you know it's activated.
Q. All right. Do you remember a moment ago we were talking about you've heard twice, correct, you've heard -- you have said twice, "You're under arrest for public disorderly conduct" --
A. Yes.
Q. -- correct? And you've said another time you're simply under arrest, correct?
A. Yes.
Q. And you've testified here today that you misspoke on the reason, correct?
A. Yes.
Q. But you believe that you had a reason to arrest him for assault, correct?
A. Looking back now, I do, yes.
Q. Okay. Do you remember when I took your deposition?
A. Yes.
MR. CAVANAUGH: May I, Your Honor?
THE COURT: You may.
MR. CAVANAUGH: May I approach, Your Honor?
THE COURT: You may.
BY MR. CAVANAUGH:

04:40

Q. We all met before, didn't we?
A. Yes.
Q. We met at the Lexington County Sheriff's Department --
A. Correct.
Q. -- correct?
A. Correct.
Q. And you had -- and that was when you were still employed, correct?
A. Correct.
Q. And you understood that I came in to take your deposition to figure -- to get your understanding of what happened and your testimony, correct?
A. Correct.
Q. And it was under oath. You understood that what you were stating that day was sworn testimony under oath --
A. Yes.
Q. -- correct?
A. Correct.
Q. And it was told you were going to tell the truth, the whole truth, and nothing but the truth --
A. Absolutely.
Q. -- correct?
A. Yeah.
Q. All right. And you did that that day, correct?
A. Yes.

04:41
Q. All right. How about flip to page 138 of your deposition, please. Are you there, Sergeant?
A. Yes, yes.
Q. Okay. Go down to 118 -- go down to line 18, okay?
A. Okay.
Q. I'm going to read the question. I want you to read the answer. Okay?
"Correct. Did you have a basis to arrest him at that point?"
And you answered how?
A. "No."
Q. My question: "Did you ever have a basis to arrest him?"
A. "No, not at that point."
Q. Okay. He had assaulted you by then, right, when you --
A. At this point?
Q. -- said he was under arrest?
A. Yes.
Q. Okay. Looking back with 20/20 hindsight, Sergeant Wilkes, you're sitting here telling this jury today, looking back, you now believe you had a reason to arrest him, correct?
A. Yes.
Q. All right. But --
A. I also said that here.
Q. Not at this point.
A. Not at this point. Not that I never had a reason to arrest

04:42 him.
Q. When did you have a reason -- you had a reason to arrest him at this point, correct?
A. At this point here, yes.
Q. Okay.
MR. CAVANAUGH: All right. Let's go ahead.
(Video continues and is playing through the following three questions and two answers.)
BY MR. CAVANAUGH:
Q. Is that a TASER charge?
A. That's the camera.
Q. The camera.
(Video continues.)
Q. Is that you?
A. Yes, that sounded like me.
(Video continues.)
MR. CAVANAUGH: Stop it for just a second, please.
(Video stopped.)
BY MR. CAVANAUGH:
Q. At this point we can't see what's going on, but we can hear.
A. Uh-huh.
Q. Where are you all at this point? Have you gotten to the point where you're up against your police car or the police -- or the sheriff's car?

04:44

A. If not fully there, close, yes.
Q. Right. And so the attempts to detain him have taken you that way, correct?
A. Correct.
Q. Okay. All right.

(Video continues and is playing through the following question and answer.)

Q. That's again just the camera, right?
A. The camera.

(Video continues.)

BY MR. CAVANAUGH:
Q. Sergeant Wilkes, let me just ask you: At this point we've seen, and you've admitted, that Stephen Gagliani had gone down initially, correct, during the initial --
A. Yes.
Q. -- struggle? And at some point we saw him get up, correct?
A. Yes.
Q. All right. But then he went down again, correct?
A. Yes.
Q. All right. And how did he get down the second time?
A. The second time, I think we got tripped up again.
Q. All right.
A. I was trying to take him down to the ground, but it did- -- it didn't actually work and we kind of --
Q. So --

04:46
A. -- got tangled up again.
Q. I apologize. I don't mean --
A. That's fine.
Q. -- to talk -- I anticipate that you're finished and then I want to talk, so I apologize for that.
A. That's fine.
Q. Okay? And so you attempted to take him down.
A. Yes.
Q. All right. Where were you when you attempted to take him down?
A. We were down by the road, but on the opposite side from the patrol cars.
Q. That's a bad question. I apologize for that. Where were -- how did you attempt to take him down? Were you standing behind him?
A. That's what I was getting to. So we were on that side and he was, I think -- I don't remember which side Kinder was on, but he was -- Mr. Gagliani was kind of actively, you know, looking at all of us like bowed up with his fists clenched, and I -- when I got behind him, as I was behind him, I thought I could use my heighth as an advantage to kind of grab him and kind of twist and take him down to the ground, but it didn't really work. Like I didn't -- wasn't able to get him to a point where I could actually take him down to the ground, but we kind of were already stumbling that way.

04:47
Q. All right. So you -- so you were behind him.
A. Correct.
Q. And you thought you could use your height. How tall were you -- are you?
A. Six foot.
Q. Six foot.
A. Yeah.
Q. And so you're behind him and your testimony is you grabbed him from behind, correct?
A. Right.
Q. All right. And took him down in a chokehold takedown, correct?
A. Absolutely not.
Q. You didn't do that.
A. No.
Q. Okay. Your testimony is just you went and grabbed him from behind.
A. Like over his shoulder.
Q. On his shoulder.
A. Right. Went from this shoulder down, and when I was trying to twist, we got tangled up and --
Q. So at this --
A. -- fell down.
Q. -- point, I just want to make sure I understand your testimony, sir, you're saying you're behind him. You don't

04:48 know where Kinder is at this moment.

A. Uh-huh.

Q. Mr. Gagliani has given you another stare, correct?

A. No, he was giving attack cues, balling a fist and bowing up.

Q. Okay. All right.

A. Yes.

Q. So you're behind him and you think, I can gain a tactical advantage because I'm standing -- because I'm taller than he is, and I can grab him from behind and take him down, correct --

A. Correct.

Q. -- to get control over him?

A. Correct.

Q. Okay. I just want to make sure I understand. And your testimony is you did not grab him around the neck --

A. No.

Q. -- and take -- okay. Just let me -- I appreciate that. Let me just finish.

That you did not take him down -- your arm did not cross his neck and you did not take him down in a chokehold takedown, correct?

A. Correct.

Q. All right. Okay. I just want to make sure I understand.

A. Okay.

04:49

Q. Okay.

MR. CAVANAUGH: All right. Go ahead.

(Video continues.)

BY MR. CAVANAUGH:

Q. Let me ask you one more question before we get to this sequence of events, okay? We just talked about the chokehold that you say was an arm bar across his shoulder area, correct? You say you took him down from behind by placing your arm across his shoulder area, correct?

A. From here, like my arm up --

Q. So like this (demonstrating).

A. -- here across. My arm over him --

Q. Gotcha.

A. -- like that (demonstrating).

Q. Understand. Both arms, correct?

A. This arm.

Q. Your left --

A. My left arm.

Q. Your left arm.

A. Yeah.

Q. Okay.

A. And this I think was on the ground.

Q. All right. And you took him down. And your arm was not across his neck.

A. No.

04:50
Q. Was your arm ever across his neck?
A. No, no.
Q. Never.
A. No, not to put pressure or do a chokehold, if that's what you're saying, no --
Q. Never --
A. -- not at all.
Q. Never during the course of this struggle, even moving forward, even -- you've sat in this courtroom, sir --
A. Uh-huh.
Q. -- and you've watched this body-worn camera multiple times now, correct?
A. Correct.
Q. You've watched it multiple times before today, correct?
A. Correct.
Q. You and I watched it during your deposition, correct?
A. I believe --
Q. Parts of it.
A. -- we did.
Q. Okay. You've seen it.
A. Yes.
Q. At no time during this struggle before you started resuscitative efforts on Mr. Gagliani did your arm go on his neck.
A. Never was my arm intentionally on his neck applying any

04:51 kind of pressure.

Now, as far as if we're moving around or stumbling or doing something, I can't -- I can't say yes to that because I don't know.

Q. All right.

A. But never was it intentionally on his neck --

Q. If you --

A. -- absolutely not.

Q. If you had realized that your arm was on his neck, you would have taken it off immediately.

A. Absolutely.

Q. No question.

A. No question.

Q. All right. Sergeant Wilkes, I'm going to walk you through this series of events here, okay, ultimately culminating in resuscitative efforts being taken on Mr. Gagliani, okay?

A. Okay.

(Pause.)

Q. All right. This -- do you recognize this part of the body-worn cam to be, or do you know it to be the body-worn camera from Deputy Thomas?

A. I do now, yes.

Q. Okay. This is not your body-worn camera --

A. No.

Q. -- correct?

04:52

A. No.
Q. This is not Deputy Kinder's body-worn cam, correct?
A. No.
Q. And this is certainly not Constable Markey's because he did not have one --
A. Right.
Q. -- correct? All right. And so we're going to start this and we're going to walk through a series of events, okay?
(Video played.)
Q. All right. Where are you at this moment?
A. I recall being more off to the side. I don't even recall the car being there at that point, but I'm on the left side of his body basically.
Q. You're on the -- he's laying this way, you're over here (indicating).
A. Right.
Q. You're off to the side.
A. Not completely off to the side --
Q. Sort of --
A. -- but off to --
Q. -- straddling.
A. Kind of.
Q. Okay. And who's on -- who's on the right side of his body?
A. Kinder.
Q. Okay. And where is Constable Markey?

04:53
A. By the video or my recollection? I see him now in the video.
Q. At his feet.
A. Yes.
Q. And Lance Thomas is coming up --
A. By his head.
Q. -- by his head --
A. Yes.
Q. -- correct? And so Mr. Gagliani is laying flat on his back at this moment --
A. Yes.
Q. -- correct? All right. With four officers surrounding him.
A. Yes.
Q. Okay.
(Video continues.)
Q. Did you hear that?
A. Yes.
Q. What was that? What was that noise, that --
MR. CAVANAUGH: Can you back it up and play it again?
(Video rewound and played.)
BY MR. CAVANAUGH:
Q. What was that?
A. Breathing.
Q. Was that Stephen Gagliani going (demonstrative sound)?

04:54
A. I just heard him trying to catch his breath like we all were, but I don't -- I don't know.
Q. That was him just trying to catch his breath.
A. I don't know, but --
Q. That was Mr. Gagliani, though, correct?
A. It sounded like it.
Q. Okay. All right.
(Video continues.)
Q. All right. Do you see this?
A. Yes.
Q. Where are you?
A. Where I said --
Q. You're off --
A. -- like --
Q. To the left.
A. Not completely off to the left, but on the left side.
Q. You're on top of him, aren't you?
A. My shoulder area looks like it is, yes.
Q. And your arm is across his neck, isn't it?
A. (No response.)
Q. Let me help you out.
A. Kind of -- do you --
Q. Just let me --
A. -- want me to answer it?
Q. -- help you out a little bit. Sorry.

04:56 (Off-the-record discussion between Mr. Cavanaugh and Mr. DeMasters.)

MR. DAVIDSON: We may have a matter to take up with the Court on this, Your Honor.

THE COURT: All right. Come on up.

(Sidebar Conference:)

MR. DAVIDSON: Hello, Judge, can you hear me?

THE COURT: Come over here.

All right. First of all, let me hear from Mr. Cavanaugh. What is this?

MR. CAVANAUGH: This is a blown-up still from the body-worn camera. Exactly what you're seeing on screen is what you're seeing this blown up.

MR. DAVIDSON: It's been accentuated. If you look at it, it's been cleaned up, it's been enhanced. If you look at the video, I can't see the video right now, but all of this has completely been enhanced and I don't think it's proper without a foundation.

THE COURT: Enhanced in terms of brightened?

MR. DAVIDSON: Brightening.

THE COURT: Lightened?

MR. DAVIDSON: Lightened, and plus this is out of context in that you're talking about a video that starts at one point and runs all the way through. The fact that you've got one frame of a multi-frame video is misleading to the jury.

04:58 They can look at the video --

MR. CAVANAUGH: Your Honor --

MR. DAVIDSON: -- and see exactly what this is and then he can ask him all the questions he wants to about it.

MR. CAVANAUGH: Your Honor, I --

MR. DAVIDSON: But to pull one video -- pull one frame out of a video, which you can't tell how old this was, when it was. If you look at the video now, it don't look anything like that.

MR. CAVANAUGH: Your Honor, I'm going to walk this jury through the fact that he had his arm across his neck for over two minutes, and there are spots in the video where he will say, I need to get off his neck. You will hear that throughout the video. And this is just simply stopping that and blowing it up such that the jury can see it clearly.

THE COURT: All right. I'm not going to allow it. I think it's been enhanced too much and they have the video.

MR. CAVANAUGH: All right.

THE COURT: You'll have to use the video.

MR. CAVANAUGH: If I have a -- I mean, this has been lightened up.

THE COURT: Yes.

MR. CAVANAUGH: If I have a non-lightened version, would that be more acceptable?

THE COURT: If there have been no other changes.

04:59

MR. CAVANAUGH: There's no edits. There's no edits.

THE COURT: It's just a complete copy of the same thing on video?

(Pause.)

MR. CAVANAUGH: This, Your Honor, is a complete copy.

THE COURT: Okay. There's been no enhancements?

MR. CAVANAUGH: No enhancements at all. This is exactly what is on the camera.

THE COURT: All right. You can use that one.

MR. DAVIDSON: Thank you, ma'am.

(Before the Jury.)

BY MR. CAVANAUGH:

Q. All right. Sergeant Wilkes, this is stopped at 10:00 on the screen, 9-18-19, 10:54.

MR. CAVANAUGH: I'm sorry, I think I marked on that. Is that what just happened?

COURTROOM DEPUTY: I can get it.

MR. CAVANAUGH: I apologize. I didn't mean to do that.

BY MR. CAVANAUGH:

Q. At 10:54 and 32 seconds. Do you see that?

A. Yes.

Q. This is an enhanced shot of that same image. Not an enhanced shot, this is a blown-up shot of that same image. Do you see that?

05:01

A. Yes.

Q. All right. Let's turn it over, Sergeant. What is that right there? Is that Stephen Gagliani's --

MR. CAVANAUGH: I'm not sure there's a good way to do this for the jury, Your Honor. May I ask the witness to come off the stand?

THE COURT: I guess so.

MR. CAVANAUGH: Okay.

THE COURT: Mr. Cavanaugh, let's take your glasses out of your mouth.

MR. CAVANAUGH: Oh, I'm sorry. I apologize, Your Honor.

BY MR. CAVANAUGH:

Q. Sergeant Wilkes, I've now flipped this upside down.

A. Yes.

Q. Okay? What is that right there?

A. That looks like my --

THE WITNESS: Is this on? I'm sorry.

THE COURT: Yes.

A. That looks like my bracelet.

BY MR. CAVANAUGH:

Q. Okay. What is this right here on the left? Is that your arm with an arm sleeve?

A. It could be.

Q. All right. Is that your arm there? Do you have a

05:02 tattoo --
A. I do.
Q. -- on your left arm?
A. I do.
Q. Okay. And so your left arm is like this, correct, in this photograph, straight down (indicating).
A. It looks like that.
Q. All right. What is this?
A. His chin.
Q. Okay. Under his chin is what?
A. His neck area.
Q. What is this? Is this your -- is this your right arm across his neck?
A. My right arm with a broken hand, yes, that's across his neck.
Q. Your hand has nothing to do with this. Your hand is over here.
A. It does.
Q. This is your arm.
A. It does have something to do with it.
Q. This is your arm across his neck; is that correct?
A. My arm is in his neck area certainly.
Q. Across his neck.
A. Okay.
Q. And just a minute ago you testified that your arm never

05:03 crossed his neck.
A. I did not testify to that.
Q. You did.
A. I testified that maybe incidentally it would come across the neck, but I never applied pressure to his throat or neck area.
Q. And then right after this what happens? You take your arm off his neck because it was incidental, because if you realized that your arm was on his neck, which you and I agree, putting the arm across your neck for any reason is improper, correct?
A. Yes.
Q. Okay. And if you had realized it, which we agree it's here, you should take it off, correct, immediately?
A. If I realized it, yes.
Q. Yeah. Because this is deadly force, correct? If you're applying pressure --
MR. DeMASTERS: Objection, conclusion.
BY MR. CAVANAUGH:
Q. If you're applying --
THE COURT: Let me hear the full question.
BY MR. CAVANAUGH:
Q. If you're applying pressure, you would agree with me that this is deadly force.
A. If you're applying pressure.
Q. Okay. But this is your arm across his neck, something you

05:04 told the jury you did not do.
A. I did not tell the jury I did not do it.
Q. Okay.
A. Go back up?
Q. Thank you, Sergeant.
A. (Returns to witness chair.)
Q. But you told me during your deposition, didn't you, that your arm never went across the front of his neck.
A. I may have.
Q. In fact, if you'll flip to page 209 of your deposition, at line 15.
A. One second. Almost there, hold on.
Q. That's okay.
A. Which line did you say?
Q. Line 15.
A. Okay.
Q. This is my question to you:
"At any time was your hand, arm -- or arm on Mr. Gagliani's neck?"
And your answer was what?
A. "Are you talking about -- it might have hit the side of his neck, but not his throat area or the front, no."
Q. "Okay. At any time, did any part of your body apply pressure to Mr. Gagliani's neck?"
A. "No."

05:05

Q. You told me unequivocally during your deposition that your arm did not hit, go across the front of his neck. It might have hit the side of his neck, but not his throat area.

That's his throat area, isn't it?

A. Yes.

(Video continues.)

Q. What did Mr. Gagliani just say?

A. "Help!"

(Video continues.)

Q. All right. Let's listen to this again.

(Video rewound and played.)

Q. He said "Help!" twice, didn't he?

A. Yes.

Q. You were there to help Mr. Gagliani, weren't you?

A. Yes.

Q. And he's laying on the ground on his back with four officers on top of him. You straddling his chest, with your arm across his neck, and he's begging you for help, begging you for help not once, but twice. Why didn't you help him?

A. We also had two injured deputies who could not just let him up and let us get injured again or further, so it wasn't just Mr. Gagliani that needed help, we all needed help.

Q. But your way of helping him was continuing to apply pressure to his neck.

A. Never applied pressure to his neck.

05:07
Q. In fact, you took your arm off, didn't you? As soon as you realized that your arm was on his neck, you took it off, didn't you? Isn't that what you -- isn't that what you told this jury?
A. Yes, I would have taken it off once I realized --
Q. Because --
A. -- certainly.
Q. -- you wouldn't have left it there.
A. Certainly not.
Q. You would have taken it off.
A. Right.
Q. Okay.
(Video continues.)
Q. Back up just a second, please.
(Video rewound and played.)
Q. Who was that --
A. Which --
Q. -- that said, "Stop resisting, buddy"?
A. That sounded like Deputy Thomas, I believe.
Q. And what at this point was Stephen Gagliani, lying on his back with four officers on top of him, doing to resist?
A. He was still trying to get up.
Q. He was panting. He was breathing for his life. He was begging you for help. But instead, you all continued to stay on top of him with your arm across his neck, didn't you?

05:09
A. We still didn't have him secure.
Q. That's not the answer -- that's not the question I asked you. Instead, you stayed on top of him with your arm across his neck, didn't you?
A. No. Like you said, I took my arm off as soon as I knew, and we still didn't have him secured so there was no way for us just to let him up.
Q. You took your arm off as soon as you realized, immediately, that you had your arm on his neck, which is not what you've testified to nor did you tell this Court and this jury, correct?
A. That's not correct. I don't know what you're saying.
Q. Okay. Go ahead.
(Video continues.)
Q. And right here earlier you saw or heard testimony from Constable Markey, and you can see it in the video, Constable Markey is pretty much just leaning up against the car at this point, isn't he, with his hands, three fingers through the handcuffs, right, with super-human strength Stephen Gagliani on his back, who's just fighting as hard as he can, isn't he?
A. He exhibited super-human strength through that whole interaction, absolutely.
Q. Right here.
A. I can't testify what Constable Markey was doing, but...
Q. Because you were sitting on top of his body with your arm

05:10

on his neck, right?
A. You keep saying the arm on the neck thing. I had no idea my arm was on his neck. It definitely wasn't applying pressure because it was broken.
Q. Okay.
(Video continues.)
Q. You see that pouncing?
A. See that what?
Q. You see that pouncing?
(Video continues.)
Q. Over here to the right of the screen --
A. Uh-huh.
Q. -- is Kinder, correct?
A. Yes.
Q. Okay. You're to Kinder's -- if I'm looking at the screen left, which means you're still sitting straddling Stephen Gagliani --
A. No.
Q. -- correct?
A. No, I wasn't straddling him.
Q. You weren't.
A. No.
Q. You were just sort of on top of him with --
A. I was trying to use my legs to keep his legs from moving at the same time.

05:11

Q. And you're pouncing on top of him, stop on top of him, pouncing your arm down, but you're not choking him, are you?
A. No.
Q. You're not.
MR. CAVANAUGH: Okay. Let's go.
(Video continues.)
BY MR. CAVANAUGH:
Q. I want you to listen to Mr. Gagliani choking in the next few seconds. I want you to listen to him choking.
MR. DeMASTERS: Objection, mischaracterization of testimony and evidence.
THE COURT: Sustained. It's not a question.
(Video continues.)
BY MR. CAVANAUGH:
Q. Do you hear anything from Mr. Gagliani in the past ten seconds?
A. On the video, no, I couldn't hear anything.
Q. You didn't. Why?
A. I don't know at this point.
Q. Because he's not breathing, is he?
A. I don't know at this point.
Q. You don't.
A. No, sir, I don't.
Q. Were you paying attention to what you were doing to this guy at this moment?

05:13
A. Yes.
Q. Did you know?
A. I was also concerned about myself with my injuries and my deputies' injuries.
Q. Were you listening to him call for help?
A. I heard him call for help, yes.
Q. Were you helping him?
A. That was the intent of the whole interaction.
(Video continues.)
Q. Did you hear that?
A. Yes.
Q. What was that?
A. It sounded like "I had my arm on his neck."
Q. Who was that?
A. It sounded like my voice.
Q. Let's listen to it again.
(Video rewound and played.)
Q. "Hold on, I've got my arm on his neck." Is that what you heard?
A. Yes.
Q. We started this at 10:56 and 32 and we're at 10:56 and 35. You never took your arm off his neck, did you?
A. I can't say what I did with my arm because -- I didn't put pressure on his neck, absolutely not.
Q. You didn't?

05:14
A. Absolutely not.
Q. You got on top of him and you were angry.
A. No.
Q. And you put your arm on his neck and you pushed down and you didn't let go until you choked the life out of him.
A. Not true.
Q. It's not.
A. It absolutely is not true.
Q. But two minutes after you started you realized immediately you needed to take your arm off his neck.
(Pause.)
MR. DeMASTERS: Objection, move to strike. That wasn't a question.
MR. CAVANAUGH: It was a question.
BY MR. CAVANAUGH:
Q. Two minutes later, after you started choking him, you realized you needed to take his arm off -- take your arm off his neck, didn't you?
A. I'm not sure where my arm was the entire time of that two minutes, so I can't say that was the first time I moved my arm.
Q. What we know is he stopped breathing during those two minutes, didn't we -- don't we?
A. I'm not sure if he'd stopped breathing at this point. You said so, but...
Q. And we know that you said, "Hold on, I need to get my arm

05:16 off his neck" two minutes after you placed it there. Isn't that true?

A. I'm not -- again, I'm not sure if my arm was there the entire two minutes, so I can't say that's true.

Q. You're not sure --

A. Right.

Q. -- but you can't tell this jury it wasn't, can you?

A. I can positively say I didn't put pressure on his neck at any point.

Q. But he died in those two minutes. And you previously told this jury and me under oath that you never had your arm across his neck. That you might have hit the side, but you never had it on his throat. And sitting here today, we've seen your arm across his throat. You've told this jury that you would immediately take it off, you can't point to any evidence that you did, and two minutes later after you started you said correct, I need to get my arm off his neck. Isn't that right?

A. I did say that, yes.

(Video continues.)

THE COURT: Whose voice is that saying, "Hey buddy, hey buddy"?

THE WITNESS: I believe that's Deputy Kinder, I think.

THE COURT: Well, we can see Kinder's mouth and it's not moving.

THE WITNESS: Oh, I'm sorry. Can we play it again so

05:17 I can listen to it?

THE COURT: Yes.

(Video rewound and played.)

THE WITNESS: Oh, that's Deputy Thomas.

THE COURT: Thomas?

THE WITNESS: Thomas, yes, Your Honor.

THE COURT: All right.

BY MR. CAVANAUGH:

Q. So Deputy Thomas said -- somebody said something, I couldn't make it out, but then he said "that or he's acting." Did you hear that? What was going on there?

A. I'm not exactly sure. You mean what --

Q. He's not breathing, is he?

A. I believe that's when I started paying attention to see if he was breathing really.

Q. Right. That's why you got off his neck, because he was lifeless.

MR. DeMASTERS: Objection, mischaracterization of evidence.

BY MR. CAVANAUGH:

Q. Isn't that correct?

THE COURT: Overruled.

BY MR. CAVANAUGH:

Q. Isn't that correct?

A. No, that's not correct.

05:18

Q. It's not.

A. No.

THE COURT: What I'm trying to figure out, Sergeant, is that, who discovered for the first time that he was not breathing? Was it Thomas?

THE WITNESS: I believe I noticed his chest wasn't rising and falling, he wasn't breathing.

THE COURT: All right. And then we hear Thomas addressing Gagliani saying, "Hey buddy, hey buddy," like he's trying to rouse him or find out if he's awake or --

THE WITNESS: Yes, Your Honor.

THE COURT: -- conscious.

THE WITNESS: Yes, Your Honor.

THE COURT: And at that point, who discovered that he was not breathing?

THE WITNESS: I'm honestly not a hundred percent. I remember that I did notice his chest wasn't rising and falling, so I'm not sure if that was exactly this point or ever after -- a little bit after.

THE COURT: All right. And so at some point very soon CPR was begun?

THE WITNESS: Yes, it is, Your Honor.

THE COURT: And who -- was it Kinder that started the CPR?

THE WITNESS: I believe Deputy Kinder started it, yes,

05:19 Your Honor.

THE COURT: All right. Thank you.

MR. CAVANAUGH: Go ahead, please.

(Video continues.)

MR. CAVANAUGH: Deputy Kinder [sic], please answer any questions your lawyers may have for you.

THE COURT: This is Sergeant Wilkes.

MR. CAVANAUGH: Sorry, my able cocounsel has just reminded me I forgot to ask something. I apologize.

Mr. Kryzston, will you rewind it to about ten seconds, please?

(Video rewound and played.)

BY MR. CAVANAUGH:

Q. What did you just hear?

A. I'm sorry?

Q. What did you just hear?

A. It sounded like Lance Thomas radioing for EMS and something about his neck again.

Q. Did you hear -- and Sergeant Wilkes, I apologize for using this language, but I heard "Get fucking off his neck." Is that what you heard?

A. I didn't hear the first part. I did hear "his neck."

Q. Who was on his neck then?

A. I don't know. I didn't see anybody on his neck the entire time of this, so...

05:21

Q. Earlier during his opening statement, your lawyer mentioned something about good policing. I guess that was good policing.
A. Is that a question?

MR. CAVANAUGH: I appreciate -- I appreciate your time today.

MR. DeMASTERS: Objection, move to strike. That wasn't a question.

THE COURT: Stricken.

MR. CAVANAUGH: I'll withdraw it. Thank you. I hope you -- please answer any questions --

THE COURT: We're going to break --

MR. CAVANAUGH: -- that defense counsel may have.

THE COURT: -- for the day now. We'll start back with cross-examination of this witness in the morning.

Ladies and gentlemen, you may take your pads and leave them in the jury room. Do not discuss the case and follow all of my instructions. We'll start back at 9:30 tomorrow morning.

(Jury not present.)

THE COURT: All right. You may be excused. Thank you.

All right. As far as tomorrow, we'll finish up with Sergeant Wilkes and then have Officer Thomas?

MR. CAVANAUGH: Yes, Your Honor. I am done with Sergeant Wilkes.

THE COURT: Right.

05:23

MR. CAVANAUGH: Unless there's any -- that goes to Mary -- unless there's any redirect, so I'm assuming they're going to cross him --

THE COURT: Right.

MR. CAVANAUGH: -- or put him up, and then I'm ready to go into Deputy Thomas, and then after that I intend to call Deputy Kinder.

THE COURT: Okay.

MR. CAVANAUGH: And Your Honor, just for --

THE COURT: Beyond that for tomorrow, do you have any other witnesses?

MR. CAVANAUGH: Yes, Your Honor. We have a officer from the South Carolina Criminal Justice Academy. Is that correct?

MR. KRZYSTON: I believe so, Your Honor.

THE COURT: All right.

MR. CAVANAUGH: And we may have hit a -- we may hit a point, Your Honor, during the day tomorrow, depending on how long their cross of Sergeant Wilkes goes, and obviously how long Thomas -- I don't anticipate Lance Thomas being this marathon. I mean, I would anticipate maybe an hour, hour and a half with Lance Thomas at the most.

Deputy Kinder may be a little while, may carry us through lunch or a little after. We can get the South Carolina Criminal Justice Academy witness up. And Your Honor, you know,

05:24 I mean, we can finish on Monday with our three experts, but certainly we're going to do what the Court wants us to do, and if you want us to put up Mr. Gagliani tomorrow because there's just too much time left in the day, we're going to be ready to do what the Court needs us to do.

THE COURT: Well, based on the conduct today, I doubt very seriously you're going to finish early tomorrow even with what you plan to do. So I don't think there will be time for --

MR. CAVANAUGH: I would hope --

THE COURT: -- Mr. Gagliani.

MR. CAVANAUGH: Your Honor, I would hope that we may be a little -- as I said, I've reviewed Deputy Thomas's testimony, and you can see from the bodycam he doesn't get there until a certain point. He's got very limited knowledge of what happened. I do want to ask him a few questions just about things. I don't anticipate him being there very long.

Deputy Kinder may take a while. He may get us through lunch.

I don't know how long the Criminal Justice Academy guy is going to go, but we're going to endeavor to move as quick as we can.

THE COURT: That would be a change.

All right. So they're going to put Wilkes back up for you to examine, Mr. DeMasters or Mr. Davidson. Then they're

05:25 going to call Thomas, then they're going to call Kinder, and if they finish early and there's a lot of time, they might call Mr. Gagliani. Oh, wait, wait, the Criminal Justice Academy person.

MR. CAVANAUGH: We are going to call that person.

THE COURT: Well, don't have the Criminal Justice Academy person waiting around here all day.

MR. CAVANAUGH: He'll be an afternoon witness, Your Honor.

THE COURT: Put him on call, because you may not even get to him, all right? All right. We'll start at 9:30 tomorrow morning.

(Proceedings adjourned at 5:26 p.m.)

* * * * *

UNITED STATES OF AMERICA )
) ss:
DISTRICT OF SOUTH CAROLINA )

C E R T I F I C A T E

I, Carly L. Horenkamp, Certified Shorthand Reporter in and for the United States District Court for the District of South Carolina, do hereby certify that I was present at and reported in machine shorthand the proceedings had the 8th day of December, 2022, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 110.

IN WITNESS WHEREOF, I have hereunto set my hand at Columbia, South Carolina, this 14th day of April, 2023.

/s/ Carly Horenkamp
Carly L. Horenkamp, RDR, CRR, CRC
Certified Shorthand Reporter

**COURTROOM DEPUTY: [2]** 4/11 90/17
**MR. CAVANAUGH: [83]**
**MR. DAVIDSON: [19]**
**MR. DeMASTERS: [30]**
**MR. KRZYSTON: [1]** 107/15
**THE COURT: [105]**
**THE WITNESS: [14]**

**'**

**'17 [1]** 9/22
**'17-18 [1]** 9/22
**'18 [1]** 9/22
**'18-19 [1]** 9/22
**'19 [1]** 9/22
**'19-20 [1]** 9/22

**1**

**10:00 [1]** 90/13
**10:54 [2]** 90/14 90/21
**10:56 [2]** 100/21 100/21
**110 [3]** 1/12 3/2 110/13
**118 [1]** 76/4
**12 [2]** 8/23 8/25
**1324 [1]** 1/19
**138 [1]** 76/1
**14th [1]** 110/15
**15 [2]** 94/11 94/15
**15th [2]** 5/24 5/25
**1611 [1]** 1/23
**17 [1]** 9/22
**18 [2]** 9/22 76/4
**19 [2]** 9/22 90/14

**2**

**20 [2]** 9/22 76/18
**20/20 [1]** 76/18
**2013 [4]** 6/9 6/10 6/11 8/11
**2014-2015 [1]** 9/21
**2015 [1]** 9/21
**2015-2016 [1]** 9/21
**2016 [1]** 9/21
**2016-17 [1]** 9/22
**2019 [3]** 11/5 11/10 20/8
**2021 [3]** 5/24 5/25 7/8
**2022 [2]** 1/3 110/9
**2023 [1]** 110/15
**209 [1]** 94/10
**2409 [1]** 1/20
**2838 [1]** 2/3
**29201 [2]** 1/20 2/7
**29202-8568 [1]** 1/24
**29205 [1]** 2/4
**2nd [1]** 1/23

**3**

**30 [1]** 74/3
**32 [2]** 90/21 100/21
**35 [1]** 100/21
**3:00 [1]** 4/18
**3:10 [2]** 1/4 4/1
**3:20-CV-03737-CMC [1]** 1/2

**4**

**4:00 [1]** 51/9
**4:01 [1]** 52/3
**4:13 [1]** 52/3

**5**

**5:26 [1]** 109/13

**8**

**8568 [2]** 1/23 1/24
**8th [2]** 20/8 110/9

**9**

**9-18-19 [1]** 90/14
**901 [2]** 2/7 22/11
**904 [1]** 23/1
**911 [2]** 15/14 15/23
**954.557.5504 [1]** 2/8
**9:30 [2]** 106/17 109/11

**A**

**ABCD [1]** 12/6
**ablazing [1]** 12/11
**able [7]**
**about [50]**
**above [1]** 110/9
**above-mentioned [1]** 110/9
**absolutely [15]**
**Academy [9]**
**accentuated [1]** 88/14
**acceptable [1]** 89/24
**account [1]** 50/6
**across [22]**
**acting [1]** 103/10
**action [4]** 12/8 45/21 45/23 46/23
**actions [1]** 41/21
**activated [2]** 60/22 74/4
**activates [1]** 61/8
**active [2]** 32/17 33/12
**actively [2]** 64/11 79/18
**actual [4]** 14/24 14/25 15/21 17/10
**actually [16]**
**addition [1]** 20/8
**additional [5]** 9/4 9/5 24/22 24/23 26/23
**addressing [1]** 104/9
**adjourned [1]** 109/13
**admitted [15]**
**advanced [1]** 72/9
**advantage [7]**
**advise [2]** 47/22 47/24
**advised [1]** 54/6
**after [15]**
**afternoon [3]** 50/10 50/13 109/8
**afterwards [1]** 23/17
**again [18]**
**against [4]** 13/5 56/15 77/24 97/17
**ago [2]** 74/5 92/25
**agree [11]**
**agreed [7]**
**ahead [10]**
**all [228]**
**all right [124]**
**allow [1]** 89/16
**almost [5]** 17/8 45/11 46/6 56/9 94/12
**alone [1]** 5/6
**already [5]** 38/6 46/12 57/14 64/13 79/25
**also [8]**
**although [1]** 45/12
**always [3]** 10/10 10/14 10/15
**am [2]** 5/19 106/23
**AMERICA [1]** 110/1
**angry [1]** 101/2
**another [6]** 14/12 14/12 20/2 43/11 74/10 81/3
**answer [11]**
**answered [1]** 76/10
**answering [5]** 30/4 30/11 33/3 34/10 43/7
**answers [8]**
**ANTHONY [1]** 1/3
**anticipate [4]** 79/4 107/20 107/21 108/17
**any [36]**
**anybody [3]** 26/19 49/1 105/24
**anyone [1]** 50/17
**anything [27]**
**anywhere [1]** 34/22
**apologize [20]**
**apparently [1]** 20/2
**appear [5]** 29/6 29/12 29/14 31/6 40/10
**APPEARANCES [3]** 1/16 1/25 2/1
**appeared [1]** 40/25
**appears [1]** 70/20
**application [1]** 10/4
**applied [2]** 93/5 95/25
**apply [2]** 94/23 95/23
**applying [6]** 83/25 93/16 93/19 93/22 93/24 98/3
**appreciate [5]** 5/16 55/8 81/18 106/4 106/4
**approach [2]** 72/21 74/23
**appropriate [7]**
**approximately [2]** 8/12 20/9
**April [1]** 110/15
**are [37]**
**area [9]**
**areas [2]** 15/20 15/21
**aren't [3]** 47/22 47/22 87/17
**arm [63]**
**arms [4]** 54/1 54/10 56/6 82/15
**Army [1]** 8/5
**around [11]**
**arrest [16]**
**arrive [1]** 26/4
**arrived [4]** 24/24 25/20 25/24 28/19
**arrives [1]** 24/13
**as [52]**
**ask [9]**
**asked [3]** 22/17 36/11 97/2
**asking [10]**
**assault [1]** 74/17
**assaulted [3]** 69/4 69/5 76/14
**assess [3]** 12/9 12/10 12/13
**assistant [1]** 7/1
**assuming [1]** 107/2
**at [181]**
**attack [3]** 24/19 47/17 81/4
**attacking [3]** 22/14 24/19 27/3
**attempt [1]** 79/14
**attempted [2]** 79/7 79/9
**attempts [2]** 54/19 78/2
**attend [2]** 8/16 10/11
**attention [2]** 99/24 103/14
**audio [8]**
**awake [1]** 104/10
**away [8]**

**B**

**back [47]**
**backs [1]** 70/9
**bad [1]** 79/13
**badge [1]** 23/3
**badly [1]** 47/25
**ball [3]** 71/2 71/9 71/10
**balled [2]** 71/23 72/6
**balling [1]** 81/4
**bar [1]** 82/7
**barefoot [1]** 44/11
**based [5]** 12/14 30/11 56/1 56/1 108/6
**basic [1]** 8/19
**basically [5]** 10/19 45/9 54/10 61/22 85/13
**basis [2]** 76/8 76/12
**be [41]**
**became [1]** 8/6
**because [42]**
**been [44]**
**beep [2]** 60/3 61/4
**beeping [2]** 61/6 73/25
**beeps [1]** 74/2
**before [19]**
**began [2]** 15/18 18/25
**begging [3]** 95/18 95/18 96/24
**beginning [4]** 20/8 23/25 24/1 25/3
**begun [1]** 104/21
**BEHALF [1]** 3/5
**behavior [3]** 28/25 41/3 41/15
**behaviors [1]** 44/3
**behind [21]**
**being [23]**
**belief [3]** 19/9 20/13 55/22
**believe [33]**
**bending [1]** 65/19
**better [3]** 16/4 17/9 17/24
**between [7]**
**beyond [3]** 45/22 46/9 107/10
**bit [4]** 57/5 58/14 87/25 104/19
**bled [1]** 8/5
**blowing [1]** 89/15
**blown [3]** 88/11 88/13 90/24
**blown-up [2]** 88/11 90/24
**body [30]**
**body-worn [9]**
**bodycam [21]**
**bodycams [2]** 60/22 60/24
**both [3]** 62/2 62/5 82/15
**bottom [1]** 34/5
**bowed [1]** 79/19
**bowing [1]** 81/4
**Box [2]** 1/20 1/23
**bracelet [1]** 91/20
**BRANDON [2]** 1/9 11/20
**break [7]**
**breaks [1]** 44/15
**breath [2]** 87/1 87/3
**breathing [10]**
**brightened [1]** 88/19
**Brightening [1]** 88/20
**bring [4]** 19/22 52/4 52/9 52/10
**broadcast [1]** 15/22
**broken [2]** 92/14 98/4
**brought [2]** 19/23 37/16
**buddy [5]** 96/18

**B**

**buddy... [4]** 102/20 102/21 104/9 104/9
**bus [3]** 27/20 27/22 49/7
**buses [1]** 44/2
**but [95]**

**C**

**calculate [2]** 30/20 30/22
**call [36]**
**calls [8]**
**calm [5]** 40/9 40/10 43/3 62/6 62/8
**calmly [2]** 40/11 48/11
**cam [3]** 40/19 84/20 85/2
**came [3]** 37/21 48/22 75/10
**camera [18]**
**cameras [2]** 15/8 61/19
**CAMERON [1]** 1/15
**can [53]**
**can't [33]**
**cannot [1]** 45/21
**car [5]** 26/20 77/24 77/25 85/12 97/17
**Carly [3]** 2/5 110/5 110/18
**CAROLINA [9]**
**carry [1]** 107/23
**cars [4]** 22/14 24/19 27/3 79/12
**case [6]** 1/2 5/4 9/17 21/23 50/14 106/16
**catch [2]** 87/1 87/3
**caused [1]** 61/5
**Cavanaugh [13]**
**certain [1]** 108/15
**certainly [5]** 85/4 92/22 96/7 96/9 108/2
**Certificate [1]** 3/2
**certification [1]** 10/20
**Certified [2]** 110/5 110/19
**certify [2]** 110/7 110/12
**chair [1]** 94/6
**chance [1]** 63/2
**change [2]** 31/5 108/23
**changed [3]** 8/23 44/10 44/14
**changes [4]** 9/17 9/17 41/21 89/25
**charge [2]** 33/24 77/10
**charging [3]** 61/1 61/2 61/3
**check [2]** 10/23 22/14
**checking [1]** 27/23
**checklist [1]** 12/6
**chest [3]** 95/17 104/6 104/17
**chin [2]** 92/9 92/10
**choked [1]** 101/5
**chokehold [4]** 80/11 81/21 82/6 83/4
**choking [4]** 99/2 99/8 99/9 101/16
**CIVIL [1]** 1/14
**civilian [1]** 7/24
**class [2]** 8/20 10/11
**Class I [1]** 8/20
**cleaned [1]** 88/15
**clear [1]** 33/22
**clearing [1]** 14/12
**clearly [1]** 89/15
**clenched [1]** 79/19
**click [1]** 60/2
**clip [2]** 25/13 25/14
**close [3]** 23/19 26/15 78/1
**closer [6]** 27/13 28/20 70/10 70/10 70/11 70/12
**CMC [1]** 1/2
**cocounsel [1]** 105/8
**Coffman [2]** 39/20 39/22
**COLUMBIA [7]**
**come [9]**
**comes [3]** 53/11 61/7 67/10
**coming [1]** 86/5
**complete [4]** 9/19 90/2 90/5 110/11
**completed [1]** 9/20
**completely [3]** 85/18 87/16 88/17
**comprehending [1]** 46/7
**computer [2]** 10/18 16/10
**concern [2]** 34/17 42/14
**concerned [7]**
**concerns [4]** 30/4 30/6 30/10 33/4
**conclusion [1]** 93/17
**conduct [4]** 69/2 69/4 74/8 108/6
**Conference [1]** 88/6
**confused [7]**
**confusing [3]** 42/7 48/24 56/5
**confusion [1]** 42/16
**connected [1]** 61/20
**conscious [1]** 104/12
**consented [4]** 17/17 17/21 18/21 18/23
**considering [2]** 36/9 48/14
**consolidated [1]** 15/8
**CONSTABLE [19]**
**cont'd [1]** 2/1
**contain [1]** 47/21
**contains [1]** 110/12
**context [1]** 88/23
**continue [3]** 1/25 21/7 52/13
**continued [1]** 96/24
**continues [37]**
**continuing [1]** 95/23
**continuous [1]** 57/17
**control [6]** 11/7 11/15 13/3 63/18 64/11 81/13
**conversations [1]** 26/18
**copy [4]** 16/23 16/23 90/2 90/5
**corner [1]** 70/18
**correct [232]**
**correctly [2]** 33/3 34/10
**Coughing [1]** 25/21
**could [23]**
**couldn't [6]** 29/2 33/11 46/23 68/17 99/17 103/10
**counsel [2]** 37/3 106/12
**counterproductive [1]** 66/11
**COUNTY [6]** 1/8 1/9 5/18 6/8 7/22 75/3
**couple [3]** 56/10 67/19 67/22
**course [1]** 83/8
**court [12]**
**Court's [1]** 21/4
**courtroom [4]** 11/22 12/16 71/12 83/9
**CPR [2]** 104/21 104/24
**CRC [2]** 2/5 110/18
**Criminal [9]**
**crisis [8]**
**critical [1]** 51/9
**cross [4]** 81/20 106/14 107/3 107/19
**cross-examination [1]** 106/14
**crossed [1]** 93/1
**CRR [2]** 2/5 110/18
**cues [1]** 81/4
**cuff [1]** 63/9
**cuffed [1]** 64/7
**cuffs [1]** 53/17
**culminating [1]** 84/15
**current [3]** 33/13 34/12 34/13
**CURRIE [1]** 1/15
**CV [1]** 1/2

**D**

**dad [1]** 6/4
**dash [1]** 49/14
**date [1]** 11/1
**David [1]** 2/2
**Davidson [4]** 1/22 1/22 4/23 108/25
**day [10]**
**de [1]** 42/24
**de-escalate [1]** 42/24
**deadly [2]** 93/15 93/23
**dealing [1]** 44/11
**DECEMBER [2]** 1/3 110/9
**decide [6]** 12/7 23/14 40/24 43/23 47/1 51/21
**decided [3]** 23/17 38/20 47/20
**decision [3]** 13/9 48/21 50/6
**decisions [1]** 34/1
**Defendants [3]** 1/12 1/22 2/2
**defense [2]** 37/3 106/12
**define [1]** 62/8
**definitely [1]** 98/3
**DeMASTERS [5]** 1/22 2/2 13/5 88/2 108/25
**DeMasters' [1]** 19/11
**demonstrate [1]** 45/24
**demonstrating [3]** 56/14 82/11 82/14
**demonstrative [22]**
**department [6]** 1/9 5/18 5/23 6/5 6/13 75/3
**depending [1]** 107/18
**depends [1]** 4/19
**deployed [2]** 73/10 73/12
**deposition [7]**
**deputies [6]** 11/6 11/6 11/11 11/13 11/19 95/20
**deputies' [1]** 100/4
**deputy [79]**
**describing [1]** 45/4
**detain [10]**
**detained [3]** 44/5 59/14 67/18
**determine [3]** 30/9 41/24 41/25
**determined [1]** 38/16
**devices [1]** 51/5
**Devine [1]** 2/3
**Devonshire [1]** 1/23
**did [102]**
**didn't [74]**
**died [1]** 102/10
**difference [6]** 6/24 15/13 17/22 20/7 20/7 45/4
**different [11]**
**differently [2]** 31/3 31/13
**direct [5]** 3/6 5/10 11/6 11/15 11/17
**direction [1]** 59/7
**disagree [1]** 29/10
**disagreed [1]** 13/20
**discovered [2]** 104/4 104/14
**discuss [3]** 50/14 50/17 106/16
**discussed [1]** 57/14
**discussion [2]** 4/22 88/1
**disorderly [3]** 69/2 69/3 74/7
**dispatch [11]**
**dispatcher [4]** 20/25 21/1 22/10 22/20
**distance [1]** 45/12
**distinction [1]** 21/8
**DISTRICT [7]**
**DIVISION [1]** 1/2
**do [84]**
**does [9]**
**doesn't [7]**
**doing [19]**
**don't [69]**
**done [13]**
**doubt [2]** 51/10 108/6
**down [31]**
**Drive [1]** 1/23
**drug [1]** 30/14
**drug-related [1]** 30/14
**drugs [2]** 31/4 31/7
**due [2]** 21/9 41/3
**duplicate [3]** 46/20 47/3 49/1
**during [16]**
**duty [2]** 4/21 4/25

**E**

**each [4]** 12/14 41/13 42/12 59/8
**earlier [12]**
**early [2]** 108/7 109/2
**edits [2]** 90/1 90/1
**efforts [2]** 83/23 84/16
**either [6]** 30/25 31/3 31/4 42/2 46/22 55/14
**else [4]** 26/19 38/5 43/17 57/13
**employed [2]** 5/17 75/7
**EMS [1]** 105/17
**end [3]** 6/18 43/10 51/7
**endeavor [1]** 108/21
**ended [4]** 6/15 9/6 39/5 59/1
**enforcement [7]**
**engaging [2]** 37/24 38/8
**enhanced [6]** 88/15 88/17 88/19 89/17 90/23 90/24
**enhancements [2]** 90/6 90/7
**enough [4]** 38/4 38/4 41/18 61/23
**entire [5]** 18/12 18/22 101/19 102/4 105/24
**escalate [1]** 42/24
**escalated [1]** 43/1

**E**

**espoused [1]** 69/8
**Esq [5]** 1/17 1/18 1/18 1/22 2/2
**essentially [1]** 17/8
**established [1]** 52/17
**Estate [1]** 1/4
**evasive [2]** 42/7 43/11
**even [7]**
**event [1]** 51/6
**events [3]** 82/6 84/15 85/8
**ever [5]** 15/18 39/4 76/12 83/1 104/18
**every [2]** 12/5 74/2
**everybody [3]** 28/10 49/9 49/11
**everyone [1]** 52/12
**everything [11]**
**evidence [28]**
**exact [2]** 32/17 57/20
**exactly [13]**
**examination [3]** 3/6 5/10 106/14
**examine [1]** 108/25
**except [2]** 17/9 47/2
**EXCERPT [1]** 1/14
**excessive [1]** 9/25
**exchange [1]** 18/18
**excruciating [1]** 66/1
**excuse [3]** 11/4 38/2 42/7
**excused [1]** 106/19
**exercise [1]** 28/16
**exhibit [8]**
**exhibited [2]** 41/15 97/21
**exhibiting [1]** 42/16
**exhibits [1]** 18/25
**expect [1]** 43/8
**expedited [1]** 23/7
**experience [8]**
**experts [1]** 108/1
**explain [1]** 45/24
**explained [1]** 44/1
**expressions [1]** 31/15
**extent [5]** 24/15 24/16 25/19 36/14 37/8
**eyes [2]** 36/6 41/23

**F**

**fact [17]**
**Fair [1]** 61/23
**fairly [1]** 62/6
**falling [2]** 104/7 104/17
**falls [1]** 60/19
**far [7]**
**fast [2]** 24/12 58/14
**fast-forward [2]** 24/12 58/14
**faster [1]** 23/8
**father [1]** 6/3
**federal [1]** 13/6
**feel [1]** 5/1
**feet [4]** 59/6 67/4 67/5 86/3
**fell [3]** 54/15 61/7 80/23
**felt [6]** 38/4 41/17 49/13 49/20 49/24 50/6
**few [2]** 99/9 108/16
**fighting [1]** 97/20
**figure [2]** 75/11 104/3
**find [1]** 104/10
**fine [5]** 4/21 19/13 51/20 79/3 79/6
**fingers [1]** 97/18
**finish [8]**
**finished [2]** 9/5 79/4
**first [16]**
**fist [3]** 71/24 72/6 81/4
**fists [1]** 79/19
**flat [1]** 86/9
**flip [2]** 76/1 94/10
**flipped [1]** 91/14
**Floor [1]** 1/23
**follow [1]** 106/16
**following [2]** 77/7 78/6
**foot [2]** 80/5 80/6
**footage [2]** 55/11 55/13
**force [4]** 9/25 9/25 93/15 93/23
**forced [3]** 45/21 45/23 46/23
**foregoing [1]** 110/10
**forgot [2]** 53/20 105/9
**form [1]** 12/6
**formulate [1]** 30/17
**Fortunately [1]** 58/1
**forward [5]** 24/12 34/2 52/19 58/14 83/9
**foundation [1]** 88/18
**four [3]** 86/12 95/16 96/21
**fours [4]** 66/16 66/20 66/22 67/2
**frame [3]** 88/25 88/25 89/6
**frankly [1]** 17/14
**front [6]** 44/10 44/14 46/7 94/8 94/22 95/2
**fucking [1]** 105/20
**full [3]** 4/7 5/14 93/20
**fully [1]** 78/1
**funny [6]** 45/2 45/3 45/4 47/14 47/15 47/16
**further [3]** 57/5 95/21 110/12

**G**

**Gadsden [1]** 1/19
**GAGLIANI [43]**
**Gagliani's [4]** 62/11 91/3 94/18 94/24
**gain [2]** 35/6 81/8
**gave [3]** 18/16 18/20 48/25
**general [1]** 10/14
**gentlemen [2]** 50/12 106/15
**get [46]**
**gets [2]** 25/4 58/22
**getting [8]**
**give [5]** 12/5 18/16 18/16 63/2 71/17
**given [4]** 19/3 39/16 71/13 81/3
**gives [3]** 38/9 43/11 47/1
**giving [2]** 39/17 81/4
**glasses [1]** 91/9
**go [46]**
**goes [2]** 107/1 107/19
**going [61]**
**gone [2]** 55/11 78/13
**good [4]** 67/19 91/4 106/2 106/2
**got [19]**
**gotcha [3]** 56/23 57/25 82/13
**gotten [3]** 55/14 55/15 77/23
**grab [9]**
**grabbed [3]** 52/21 80/8 80/16
**great [2]** 49/25 50/4
**ground [29]**
**guard [4]** 5/3 8/6 8/7 8/8
**guess [3]** 7/2 91/7 106/2
**guns [2]** 12/11 12/12
**guy [5]** 44/11 48/11 49/2 99/25 108/20

**H**

**had [76]**
**half [1]** 107/22
**hand [21]**
**handcuff [4]** 52/25 53/1 54/10 54/19
**handcuffed [9]**
**handcuffs [2]** 55/18 97/19
**hands [14]**
**hang [1]** 64/10
**happened [7]**
**happens [4]** 53/18 55/4 55/9 93/7
**happy [1]** 20/10
**hard [1]** 97/20
**has [16]**
**hasn't [2]** 12/24 34/7
**hate [1]** 4/15
**have [104]**
**haven't [1]** 67/22
**he [185]**
**he'd [4]** 31/21 31/24 32/1 101/23
**He'll [1]** 109/8
**he's [44]**
**head [3]** 46/12 86/6 86/7
**health [11]**
**hear [34]**
**heard [27]**
**hearing [3]** 25/15 57/8 63/17
**height [1]** 80/3
**heighth [1]** 79/21
**Hello [1]** 88/7
**help [21]**
**helping [2]** 95/23 100/7
**here [39]**
**hereby [1]** 110/7
**hereunto [1]** 110/14
**hey [6]** 48/11 68/7 102/20 102/21 104/9 104/9
**Highway [1]** 23/11
**Highway 1 [1]** 23/11
**him [178]**
**himself [4]** 29/16 30/3 33/11 42/2
**hindsight [1]** 76/18
**hired [2]** 6/12 8/11
**his [148]**
**hit [7]**
**hold [11]**
**home [3]** 6/3 6/4 37/19
**honestly [2]** 28/10 104/16
**Honor [63]**
**HONORABLE [1]** 1/15
**hope [3]** 106/9 108/10 108/12
**Horenkamp [3]** 2/5 110/5 110/18
**host [2]** 41/5 41/8
**hour [2]** 107/21 107/21
**house [1]** 70/10
**how [19]**
**huh [14]**
**human [2]** 97/19 97/21
**hundred [1]** 104/16

**I**

**I'd [2]** 14/24 16/5
**I'll [3]** 5/3 51/24 106/9
**I'm [76]**
**I've [7]**
**ID [9]**
**idea [3]** 49/25 50/4 98/2
**identify [1]** 19/10
**if [74]**
**II [1]** 1/22
**image [2]** 90/23 90/24
**immediate [1]** 52/18
**immediately [9]**
**important [1]** 49/4
**improper [1]** 93/10
**improve [1]** 19/12
**in [123]**
**incident [6]** 7/17 11/2 13/25 14/6 20/14 63/19
**incidental [1]** 93/8
**incidentally [1]** 93/4
**included [4]** 9/11 9/24 10/4 21/1
**incorrect [2]** 21/21 69/9
**indicating [2]** 85/15 92/6
**Individually [1]** 1/3
**individuals [2]** 11/5 12/1
**influence [2]** 30/25 40/25
**information [12]**
**initial [2]** 20/20 78/14
**initially [2]** 58/20 78/14
**injured [2]** 95/20 95/21
**injuries [2]** 100/3 100/4
**inside [1]** 37/14
**instead [4]** 14/23 43/23 96/24 97/3
**instructions [1]** 106/17
**intend [1]** 107/6
**intended [3]** 18/2 69/10 69/12
**intent [2]** 69/11 100/8
**intentionally [2]** 83/25 84/6
**interact [1]** 26/20
**interacting [3]** 28/5 41/20 45/12
**interaction [7]**
**interrupt [1]** 35/9
**into [28]**
**intoxicated [2]** 31/7 39/19
**involved [1]** 12/12
**is [194]**
**isn't [11]**
**issue [3]** 18/21 19/11 19/11
**issued [2]** 35/15 43/13
**it [228]**
**it's [44]**
**itself [3]** 41/11 42/9 42/19

**J**

**jail [2]** 48/12 48/13
**James [1]** 1/17
**JASON [7]**
**Joseph [1]** 1/18
**JUDGE [2]** 1/15 88/7
**judgment [1]** 12/7
**jump [1]** 67/15
**jumping [1]** 33/1
**jumps [1]** 67/10
**jury [30]**
**just [94]**

**J**

**Justice [9]**
**justification [1]** 41/12

**K**

**keep [6]** 4/9 5/3 39/22 47/15 98/2 98/24
**kept [2]** 10/25 67/17
**kids [4]** 27/20 27/22 49/7 49/11
**kind [12]**
**kinda [1]** 59/6
**KINDER [60]**
**Kinder's [17]**
**knew [8]**
**knife [1]** 47/8
**knocked [6]** 54/16 54/16 54/17 55/14 55/15 60/6
**knocking [1]** 64/12
**know [45]**
**knowledge [7]**
**knows [1]** 47/2
**Kryzston [3]** 16/16 69/21 105/10
**Kryzston's [1]** 17/19
**Krzyston [1]** 1/18

**L**

**Ladies [2]** 50/12 106/15
**Lance [5]** 4/15 86/5 105/17 107/20 107/22
**LANEY [1]** 2/3
**language [2]** 32/9 105/20
**last [4]** 18/19 54/24 54/24 63/2
**later [4]** 20/10 73/4 101/16 102/16
**law [9]**
**LAWRENCE [1]** 1/10
**lawyer [1]** 106/1
**lawyers [1]** 105/6
**laying [3]** 85/14 86/9 95/16
**leaned [1]** 59/7
**leaning [2]** 36/13 97/17
**learn [1]** 45/25
**learned [1]** 46/13
**least [1]** 16/1
**leave [4]** 5/6 5/22 50/13 106/15
**leaving [2]** 9/7 49/4
**left [18]**
**legal [8]**
**legs [2]** 98/24 98/24
**let [24]**
**let's [13]**
**LEXINGTON [6]** 1/8 1/9 5/18 6/7 7/22 75/3
**life [2]** 96/23 101/5
**lifeless [1]** 103/17
**light [1]** 70/2
**lightened [4]** 88/21 88/22 89/21 89/23
**lights [4]** 23/7 26/7 26/9 26/11
**like [68]**
**likely [1]** 38/21
**limited [1]** 108/15
**line [4]** 76/4 94/11 94/14 94/15
**list [2]** 15/8 49/7
**listen [6]** 23/13 95/10 99/8 99/9 100/16 103/1
**listened [2]** 17/15 48/24
**listening [2]** 15/17 100/5
**little [8]**
**LLC [2]** 1/19 2/3
**loaded [1]** 16/9
**long [5]** 8/22 107/19 107/20 108/17 108/20
**longer [2]** 8/8 51/2
**look [10]**
**looked [4]** 42/5 45/2 47/13 47/16
**looking [19]**
**looks [5]** 67/11 87/18 91/17 91/20 92/7
**lost [2]** 17/13 17/14
**lot [2]** 56/24 109/2
**loud [1]** 15/20
**louder [3]** 15/23 19/4 21/15
**lunch [2]** 107/24 108/19
**lying [1]** 96/20

**M**

**ma'am [1]** 90/10
**machine [1]** 110/8
**made [9]**
**make [14]**
**makes [3]** 47/25 64/15 74/3
**making [9]**
**manifestations [1]** 40/13
**manipulate [1]** 21/20
**manipulated [3]** 21/10 21/12 21/21
**many [4]** 8/2 11/9 22/17 50/8
**marathon [1]** 107/21
**March [6]** 6/9 6/10 6/11 8/13 8/14 8/15
**mark [1]** 18/18
**marked [2]** 21/14 90/15
**MARKEY [20]**
**Markey's [1]** 85/4
**Mary [1]** 107/2
**master [9]**
**matter [1]** 88/3
**MATTHEW [5]** 1/14 3/5 4/8 4/10 5/15
**may [27]**
**maybe [2]** 93/4 107/21
**MCGOWAN [1]** 1/15
**me [63]**
**mean [31]**
**means [1]** 98/16
**median [1]** 23/11
**meet [1]** 18/18
**mental [10]**
**mentioned [2]** 106/1 110/9
**met [2]** 75/1 75/3
**middle [4]** 19/24 22/14 24/19 27/3
**might [12]**
**military [4]** 7/24 7/25 45/15 45/18
**Mills [4]** 20/20 20/23 25/13 25/15
**mind [4]** 4/13 9/14 30/24 49/11
**mine [1]** 20/4
**minute [4]** 21/16 73/16 74/3 92/25
**minutes [15]**
**mischaracterization [2]** 99/10 103/18
**misleading [1]** 88/25
**misspoke [1]** 74/13
**moment [25]**
**Monday [1]** 108/1
**month [1]** 8/12
**more [9]**
**morning [5]** 14/10 50/24 106/14 106/17 109/12
**most [2]** 58/1 107/22
**mouth [3]** 35/20 91/10 102/23
**move [11]**
**moved [4]** 38/25 55/2 57/5 101/20
**movements [1]** 43/19
**moves [1]** 49/15
**moving [6]** 56/15 57/15 83/8 84/2 98/24 102/24
**Mr [8]**
**Mr. [60]**
**Mr. Cavanaugh [9]**
**Mr. Coffman [1]** 39/20
**Mr. Davidson [2]** 4/23 108/25
**Mr. DeMasters [3]** 13/5 88/2 108/25
**Mr. DeMasters' [1]** 19/11
**Mr. Gagliani [33]**
**Mr. Gagliani's [3]** 62/11 94/18 94/24
**Mr. Kryzston [3]** 16/16 69/21 105/10
**Mr. Kryzston's [1]** 17/19
**Mr. Markey [2]** 16/21 18/5
**Mr. Wilkes [2]** 5/21 50/16
**Ms [1]** 2/5
**Ms. [2]** 20/20 20/23
**Ms. Mills [2]** 20/20 20/23
**much [4]** 51/2 89/17 97/17 108/4
**multi [1]** 88/25
**multi-frame [1]** 88/25
**multiple [4]** 17/18 19/13 83/11 83/14
**must [2]** 73/11 73/21
**muted [1]** 20/21
**my [47]**
**myself [1]** 100/3

**N**

**name [2]** 4/7 5/14
**narcotics [1]** 41/1
**necessarily [1]** 41/11
**neck [57]**
**need [7]**
**needed [5]** 47/20 95/22 95/22 101/10 101/17
**needs [2]** 44/5 108/5
**neighborhood [4]** 26/6 26/8 26/10 38/20
**never [16]**
**next [9]**
**no [104]**
**No. [2]** 15/8 19/1
**No. 1 [2]** 15/8 19/1
**nobody [1]** 47/1
**noise [8]**
**non [1]** 89/23
**non-lightened [1]** 89/23
**nor [1]** 97/10
**not [171]**
**notes [1]** 110/11
**nothing [13]**
**notice [1]** 104/17
**noticed [7]**
**notified [1]** 14/6
**now [29]**

**O**

**oath [3]** 75/14 75/15 102/11
**objection [8]**
**observation [2]** 27/19 28/20
**observations [1]** 27/15
**observe [5]** 28/1 30/2 32/7 32/9 32/11
**observed [1]** 36/19
**observing [1]** 29/23
**obviously [2]** 62/24 107/19
**occurred [1]** 59/2
**October [2]** 5/24 5/25
**October 15th [1]** 5/24
**off [58]**
**offer [1]** 18/2
**offered [1]** 59/11
**office [1]** 9/7
**officer [14]**
**officers [6]** 4/24 12/20 50/8 86/12 95/17 96/21
**Official [1]** 2/6
**often [1]** 74/2
**oh [6]** 41/7 60/19 91/11 102/25 103/4 109/3
**okay [158]**
**old [1]** 89/7
**on [176]**
**once [4]** 50/5 65/25 95/19 96/5
**one [52]**
**ones [2]** 17/7 20/5
**only [10]**
**opening [8]**
**opportunity [2]** 28/20 68/12
**opposite [4]** 65/8 70/5 70/6 79/11
**or [84]**
**original [1]** 21/2
**originally [2]** 6/12 8/11
**other [16]**
**others [4]** 29/18 30/3 33/10 42/2
**our [7]**
**out [26]**
**outside [3]** 37/16 37/21 48/11
**outward [2]** 31/15 40/13
**over [18]**
**Overruled [2]** 12/24 103/22
**own [1]** 59/14

**P**

**p.m [5]** 1/4 4/1 52/3 52/3 109/13
**P.O [2]** 1/20 1/23
**PA [1]** 1/22
**pads [2]** 50/14 106/15
**page [4]** 1/25 3/5 76/1 94/10
**pages [2]** 1/12 110/13
**pages 1 [1]** 110/13
**pain [1]** 66/1
**panting [1]** 96/23
**pants [3]** 47/10 47/18 49/19
**paraphrasing [1]** 63/16
**park [1]** 26/15
**part [6]** 21/2 24/13 72/23 84/19 94/23 105/22

**P**

**particular [1]** 72/13
**Parts [1]** 83/18
**pass [1]** 67/25
**passed [2]** 67/24 68/1
**passively [1]** 64/14
**past [1]** 99/15
**patrol [2]** 6/14 79/12
**Pause [4]** 20/18 84/18 90/4 101/11
**paying [2]** 99/24 103/14
**people [10]**
**perceive [3]** 32/15 32/20 33/7
**percent [1]** 104/16
**person [5]** 20/16 29/7 109/4 109/5 109/7
**Personal [1]** 1/4
**phone [1]** 22/7
**photograph [1]** 92/6
**physical [1]** 64/12
**physically [14]**
**piece [2]** 41/13 42/12
**pinpoint [4]** 41/3 41/5 42/4 44/9
**pitting [3]** 12/23 13/4 13/6
**placed [2]** 18/7 102/1
**placing [1]** 82/8
**plaintiff [4]** 1/6 1/17 3/5 4/4
**plaintiff's [2]** 4/10 15/7
**plaintiffs [1]** 19/1
**plan [1]** 108/8
**planted [1]** 67/3
**play [10]**
**played [15]**
**playing [2]** 77/7 78/6
**please [20]**
**plus [1]** 88/22
**point [104]**
**pointer [1]** 70/15
**points [1]** 58/1
**police [4]** 7/24 7/25 77/24 77/24
**policing [2]** 106/2 106/2
**pop [1]** 60/2
**POPE [1]** 2/3
**portion [1]** 20/17
**portions [1]** 16/3
**pose [2]** 28/6 29/6
**positioning [1]** 12/20
**positively [1]** 102/8
**possession [1]** 24/17
**possibility [1]** 47/21
**possibly [2]** 40/25 41/25
**potential [1]** 12/4
**pouncing [4]** 98/7 98/9 99/1 99/2
**precedes [1]** 7/22
**prefer [4]** 5/21 5/21 14/24 17/11
**present [4]** 51/1 52/11 106/18 110/8
**presentation [1]** 9/19
**pressure [12]**
**pretty [3]** 22/23 23/19 97/17
**previous [1]** 44/3
**previously [2]** 71/12 102/10
**prior [3]** 8/4 8/5 18/18
**priority [1]** 49/7
**privy [1]** 25/17
**problem [4]** 19/6 25/15 30/14 51/21
**problems [1]** 11/1
**proceedings [2]** 109/13 110/8
**promoted [5]** 6/15 6/18 6/19 6/20 7/3
**proper [1]** 88/17
**provided [5]** 17/25 18/1 19/16 19/18 20/4
**prudent [1]** 50/7
**public [3]** 69/2 69/3 74/7
**pull [4]** 47/18 56/6 89/6 89/6
**pulled [6]** 4/24 23/12 26/6 26/10 26/11 26/19
**pulling [2]** 54/1 66/4
**pupils [5]** 38/11 41/3 41/5 42/5 44/10
**purposes [1]** 18/24
**push [1]** 54/2
**pushed [1]** 101/4
**pushing [2]** 56/15 64/12
**put [24]**
**putting [1]** 93/9

**Q**

**question [17]**
**questions [14]**
**quick [1]** 108/21
**quite [1]** 17/14
**quo [1]** 44/11

**R**

**radio [8]**
**radioing [1]** 105/17
**raise [3]** 4/6 71/8 71/9
**raising [1]** 44/17
**rather [4]** 14/25 15/11 16/5 16/6
**RDR [2]** 2/5 110/18
**reach [7]**
**reached [2]** 39/2 52/21
**react [2]** 47/25 50/4
**read [2]** 76/6 76/6
**ready [3]** 39/5 107/5 108/4
**realized [11]**
**realizing [1]** 17/21
**really [10]**
**reason [14]**
**reasons [2]** 41/6 41/9
**recall [17]**
**received [4]** 23/10 24/22 27/2 32/25
**Recess [1]** 52/3
**recognize [5]** 22/7 25/1 46/18 60/13 84/19
**recognized [1]** 47/16
**recollection [2]** 72/19 86/1
**record [2]** 4/22 88/1
**recording [1]** 60/20
**redirect [1]** 107/2
**refresh [1]** 72/17
**refusing [1]** 54/3
**regarding [1]** 13/20
**regardless [1]** 31/13
**related [1]** 30/14
**relates [2]** 12/19 13/21
**relayed [3]** 22/13 22/20 24/18
**release [3]** 5/2 51/11 54/10
**remember [19]**
**reminded [1]** 105/9
**repetitive [1]** 52/5
**reported [2]** 2/6 110/8
**Reporter [3]** 2/6 110/6 110/19
**Representative [1]** 1/4
**resist [1]** 96/21
**resisted [1]** 55/3
**resisting [19]**
**resource [1]** 4/25
**respect [1]** 21/9
**respond [3]** 12/4 12/14 31/3
**responding [2]** 11/25 22/13
**response [9]**
**responses [1]** 30/7
**resuscitative [2]** 83/23 84/16
**retreated [1]** 37/19
**Returns [1]** 94/6
**reviewed [2]** 40/6 108/13
**rewind [1]** 105/10
**rewound [8]**
**Richland [1]** 2/7
**right [311]**
**right-hand [1]** 70/16
**RILEY [1]** 2/3
**risen [2]** 66/13 66/16
**rising [2]** 104/7 104/17
**road [4]** 22/15 24/20 27/3 79/11
**role [3]** 6/12 6/18 7/6
**roll [1]** 65/23
**rolled [3]** 65/24 65/25 66/4
**room [1]** 106/16
**rouse [1]** 104/10
**rule [1]** 13/5
**run [3]** 44/19 47/19 51/21
**running [1]** 44/3
**runs [1]** 88/24

**S**

**safe [2]** 38/4 41/17
**safety [1]** 59/15
**said [29]**
**same [10]**
**sat [1]** 83/9
**saw [11]**
**say [46]**
**saying [22]**
**says [1]** 20/9
**SC [5]** 1/4 1/20 1/24 2/4 2/7
**scales [2]** 44/15 46/11
**scanning [1]** 28/23
**scene [19]**
**school [6]** 4/25 5/3 27/20 27/22 44/2 49/7
**schoolkids [2]** 38/19 49/6
**screen [5]** 20/10 88/12 90/14 98/11 98/15
**seat [1]** 52/12
**seats [1]** 50/14
**second [9]**
**seconds [5]** 74/3 90/21 99/9 99/16 105/10
**secure [3]** 52/23 52/24 97/1
**secured [1]** 97/6
**see [64]**
**seeing [8]**
**seem [5]** 16/3 28/6 28/7 36/4 62/6
**seemed [2]** 39/11 39/15
**seems [2]** 17/9 62/5
**seen [7]**
**send [2]** 5/2 38/1
**sense [4]** 30/7 30/8 49/13 64/15
**sent [2]** 20/5 37/25
**separate [1]** 17/7
**separately [1]** 41/13
**September [2]** 11/9 20/8
**September 8th [1]** 20/8
**sequence [2]** 72/13 82/6
**sergeant [38]**
**series [2]** 84/15 85/8
**seriously [1]** 108/7
**set [1]** 110/14
**shaking [1]** 56/11
**SHERIFF [3]** 1/8 6/8 7/23
**sheriff's [8]**
**shirt [1]** 44/12
**shirtless [1]** 28/16
**shoes [1]** 28/16
**shoot [4]** 22/15 24/20 27/4 33/1
**shorthand [3]** 110/5 110/8 110/19
**shortly [1]** 14/19
**shorts [2]** 28/16 44/11
**shot [4]** 66/8 90/23 90/24 90/24
**should [3]** 4/25 15/11 93/13
**shoulder [6]** 80/18 80/19 80/20 82/7 82/9 87/18
**show [5]** 45/20 46/22 47/3 66/22 70/19
**showing [1]** 72/17
**shut [1]** 55/15
**sic [1]** 105/5
**side [25]**
**sidebar [2]** 21/16 88/6
**sign [4]** 23/3 23/3 23/4 23/5
**signs [2]** 28/25 42/19
**simply [4]** 42/16 64/20 74/10 89/14
**since [2]** 6/4 15/18
**sir [17]**
**siren [1]** 26/7
**sirens [3]** 23/7 26/9 26/11
**sit [1]** 64/10
**sitting [5]** 64/14 76/19 97/25 98/16 102/13
**situation [8]**
**situational [1]** 31/6
**Six [4]** 8/3 8/4 80/5 80/6
**SLED [5]** 71/19 71/23 71/25 72/8 72/12
**sleeve [1]** 91/23
**slides [2]** 20/11 20/11
**so [117]**
**solve [1]** 19/6
**some [17]**
**somebody [9]**
**someone [5]** 41/12 42/20 46/5 60/7 64/7
**someone's [1]** 19/24
**something [23]**
**sometimes [1]** 47/24
**somewhere [1]** 65/8
**soon [4]** 96/1 97/5 97/8 104/20
**sorry [16]**
**sort [6]** 56/14 57/15 60/19 70/2 85/19 98/23
**sound [2]** 25/21 86/25
**sounded [8]**
**sounds [3]** 9/23 16/21 21/15
**SOUTH [9]**

**S**

**speak [4]** 5/3 8/20 57/20 68/7
**speaking [2]** 28/5 40/11
**specific [2]** 28/13 44/4
**specifically [1]** 14/5
**spots [1]** 89/12
**ss [1]** 110/1
**stand [6]** 4/5 17/20 50/3 51/3 51/19 91/6
**standing [16]**
**stare [9]**
**start [6]** 38/8 41/20 85/7 106/13 106/17 109/11
**started [11]**
**starting [2]** 71/2 71/8
**starts [2]** 60/20 88/23
**state [5]** 1/10 4/7 33/23 35/15 43/13
**state-issued [2]** 35/15 43/13
**statement [7]**
**STATES [4]** 1/1 1/15 110/1 110/6
**stating [2]** 72/9 75/15
**status [1]** 44/11
**stay [3]** 6/3 6/4 96/24
**stay-at-home [2]** 6/3 6/4
**stayed [1]** 97/3
**stenographic [1]** 110/11
**STENOGRAPHICALLY [1]** 2/5
**step [7]**
**Stephen [9]**
**Steve [2]** 25/2 29/20
**stick [1]** 47/10
**still [16]**
**stood [1]** 56/6
**stop [9]**
**stopped [6]** 14/22 34/19 77/18 90/13 101/21 101/23
**stopping [1]** 89/14
**straddling [4]** 85/21 95/17 98/16 98/20
**straight [4]** 45/22 50/20 55/7 92/6
**strategic [1]** 13/9
**street [10]**
**strength [2]** 97/19 97/21
**Stricken [1]** 106/8
**strike [2]** 101/12 106/6
**struggle [5]** 55/17 58/18 78/16 83/8 83/22
**struggling [2]** 62/6 65/14
**stuff [1]** 28/25
**stumbled [1]** 59/7
**stumbling [2]** 79/25
84/2
**such [2]** 54/10 89/15
**suffering [7]**
**suggestion [2]** 21/20 51/18
**super [2]** 97/19 97/21
**super-human [2]** 97/19 97/21
**supervise [1]** 11/5
**supervising [1]** 33/20
**supervision [1]** 11/17
**supervisor [1]** 7/1
**supposed [7]**
**sure [30]**
**surrounding [1]** 86/12
**surveillance [1]** 37/3
**suspect [5]** 22/14 24/18 24/19 27/3 51/18
**suspicions [1]** 30/9
**Sustained [1]** 99/12
**sworn [3]** 4/9 4/10 75/15

**T**

**tactical [7]**
**take [31]**
**takedown [2]** 80/11 81/21
**taken [5]** 78/2 84/10 84/16 96/5 96/10
**taking [5]** 13/2 30/22 36/8 38/18 50/6
**talk [5]** 35/1 39/24 71/13 79/4 79/5
**talked [1]** 82/6
**talking [17]**
**tall [1]** 80/3
**taller [1]** 81/9
**tangled [3]** 59/6 79/1 80/21
**tase [8]**
**tased [9]**
**TASER [17]**
**tasing [1]** 67/16
**tattoo [1]** 92/1
**taught [2]** 42/24 47/22
**technically [1]** 15/15
**tell [15]**
**telling [7]**
**tells [1]** 55/5
**ten [6]** 4/18 20/9 50/15 52/1 99/15 105/10
**Teresa [2]** 25/13 25/15
**term [1]** 45/9
**terms [1]** 88/19
**testified [7]**
**testify [2]** 93/2 97/24
**testimony [17]**
**than [11]**
**Thank [13]**
**that [403]**
**that's [64]**
**their [7]**
**theirs [1]** 21/10
**them [16]**
**then [34]**
**there [51]**
**there's [17]**
**they [36]**
**they'll [1]** 9/18
**they're [20]**
**they've [1]** 20/12
**Thickens [2]** 1/18 1/19
**thing [15]**
**things [3]** 31/15 48/8 108/17
**think [32]**
**thinking [1]** 30/25
**thinks [2]** 17/21 21/22
**this [207]**
**Thomas [20]**
**Thomas's [1]** 108/13
**thoroughly [1]** 45/24
**those [11]**
**though [2]** 46/11 87/5
**thought [7]**
**thousand [7]**
**thousand-yard [7]**
**threat [28]**
**threatening [8]**
**threats [1]** 40/13
**three [4]** 11/11 77/7 97/18 108/1
**threw [1]** 56/9
**throat [6]** 93/5 94/22 95/3 95/4 102/13 102/14
**through [20]**
**throughout [2]** 56/14 89/14
**tied [1]** 4/16
**time [51]**
**times [5]** 17/18 19/14 56/10 83/11 83/14
**tipped [1]** 46/11
**tipping [2]** 44/7 47/5
**tips [1]** 44/15
**today [15]**
**together [4]** 42/12 42/12 44/6 46/10
**told [17]**
**tomorrow [9]**
**too [5]** 17/15 40/4 49/11 89/17 108/4
**took [10]**
**top [14]**
**totality [2]** 44/1 48/8
**towards [10]**
**trained [4]** 11/25 45/14 46/14 49/1
**training [16]**
**transcript [3]** 110/10 110/11 110/12
**trial [5]** 1/14 15/18 18/12 18/22 18/25
**tried [2]** 39/2 54/9
**tripped [1]** 78/21
**true [6]** 34/14 101/6
101/8 102/2 102/4 110/10
**truth [3]** 75/19 75/20 75/20
**try [5]** 35/4 39/4 44/23 53/17 54/5
**trying [30]**
**turn [6]** 20/10 57/20 60/22 60/24 61/12 91/2
**turned [2]** 71/1 71/5
**turns [1]** 24/10
**twice [5]** 58/15 74/6 74/7 95/12 95/19
**twist [2]** 79/22 80/21
**two [21]**

**U**

**U.S [1]** 2/6
**uh [14]**
**uh-huh [14]**
**ultimately [3]** 53/1 65/17 84/15
**under [13]**
**understand [21]**
**understanding [4]** 17/16 18/24 42/20 75/11
**understands [1]** 33/23
**understood [2]** 75/10 75/14
**unequivocally [1]** 95/1
**UNITED [4]** 1/1 1/15 109/15 110/6
**unless [4]** 12/12 20/2 107/1 107/2
**until [5]** 26/20 50/24 51/11 101/5 108/15
**up [88]**
**update [2]** 9/15 9/16
**updates [6]** 9/11 9/20 9/21 9/24 10/2 10/12
**upper [1]** 70/2
**upside [1]** 91/14
**us [22]**
**use [14]**
**used [8]**
**using [15]**

**V**

**vantage [1]** 63/12
**vehicle [2]** 26/15 26/16
**version [4]** 20/21 20/21 21/23 89/23
**versus [2]** 17/10 20/21
**very [9]**
**via [2]** 10/10 27/2
**vid [1]** 40/18
**video [93]**
**videos [5]** 16/3 17/5 18/1 18/2 20/5
**voice [9]**
**volume [2]** 19/12 19/13

**W**

**wait [3]** 68/11 109/3
109/3
**waiting [1]** 109/7
**walk [10]**
**walked [8]**
**walking [5]** 27/11 27/15 27/17 27/21 31/10
**walks [1]** 35/12
**Walter [1]** 1/5
**want [27]**
**wanted [1]** 4/25
**wants [2]** 89/4 108/2
**was [236]**
**wasn't [37]**
**waste [1]** 21/4
**watch [2]** 9/19 10/17
**watched [3]** 83/11 83/14 83/16
**watching [1]** 66/25
**way [12]**
**we [116]**
**we'd [1]** 17/11
**we'll [9]**
**we're [31]**
**we've [9]**
**weapon [3]** 32/11 32/13 34/8
**weapons [6]** 28/13 28/25 29/1 29/2 29/8 41/15
**week [2]** 18/19 18/19
**weeks [2]** 8/23 8/25
**weight [3]** 54/2 56/9 59/5
**welfare [1]** 22/13
**well [23]**
**went [16]**
**were [68]**
**weren't [5]** 18/6 25/17 30/7 95/14 98/21
**what [165]**
**what's [8]**
**when [57]**
**where [28]**
**WHEREOF [1]** 110/14
**whether [2]** 5/1 31/14
**which [17]**
**while [8]**
**whip [1]** 47/8
**who [17]**
**who's [3]** 85/23 85/23 97/20
**whole [5]** 29/23 51/6 75/19 97/21 100/8
**whose [2]** 24/6 102/20
**why [20]**
**WILKES [35]**
**will [9]**
**William [1]** 1/22
**willingly [1]** 37/22
**wirelessly [1]** 61/20
**wish [1]** 19/23
**withdraw [1]** 106/9
**within [2]** 48/14 48/15

## W

**without [1]** 88/17
**witness [8]**
**witnesses [1]** 107/11
**word [2]** 71/21 71/21
**words [1]** 35/20
**work [4]** 6/7 51/25 78/24 79/23
**works [1]** 60/21
**worn [9]**
**worried [4]** 32/24 38/18 38/19 49/22
**would [35]**
**wouldn't [9]**
**WREN [1]** 1/22

## Y

**yard [7]**
**yeah [23]**
**year [1]** 8/6
**yearly [2]** 9/9 9/11
**years [3]** 8/2 8/3 8/4
**yes [216]**
**yesterday [1]** 37/3
**yet [2]** 12/24 24/8
**you [634]**
**you'd [1]** 32/25
**you'll [2]** 89/19 94/10
**you're [91]**
**you've [18]**
**your [196]**
**yours [1]** 20/3
**yourself [2]** 23/15 33/10